**Brandon P. GROSSI, An Individual, Appellee**

v.

**TRAVELERS PERSONAL INSURANCE COMPANY, A Corporation, Appellant.**

**Brandon P. Grossi, Appellant**

v.

**Travelers Personal Insurance Company, A Corporation, Appellee.**

Superior Court of Pennsylvania.

Argued April 3, 2013.

Filed Nov. 1, 2013.

Reargument Denied Dec. 16, 2013.

Alan S. Miller, Pittsburgh, for Travelers.

Kelly M. Tocci, Aliquippa, for Grossi.

BEFORE: BOWES, J., DONOHUE, J., and MUNDY, J.

OPINION BY MUNDY, J.:

Before the Court are cross-appeals filed by Defendant, Travelers Personal Insurance Company (Travelers), and Plaintiff, Brandon P. Grossi (Grossi), from the April 18, 2012 order disposing of the parties' cross-motions for post-trial relief, and directing the prothonotary to enter judg-

ment against Travelers and in favor of Grossi for $1,478,815.94.[1] After careful review, we affirm in part, vacate in part, and remand for entry of a corrected verdict in accordance with this opinion.

The instant matter stems from a December 24, 2006 automobile accident in which Grossi, a passenger in a vehicle owned by Tarquinio Brothers Bakery, and driven by Michael Tarquinio, was severely injured. Grossi retained counsel, Keith R. McMillen, Esquire, of McMillen, Urick, Tocci, Fouse & Jones, to pursue his personal injury claims. Tarquinio Brothers Bakery had liability and umbrella insurance policies, providing a total coverage of $3,000,000.00. The liability of Michael Tarquinio and Tarquinio Brothers Bakery was not disputed. In addition, Grossi was an insured under his parents' policy with Travelers, which included coverage for $1,000,000.00 in medical benefits and underinsured motorist (UIM) coverage in the amount of $300,000.00. Under that policy, Travelers paid approximately $500,000.00 in first party medical expenses and $25,000.00 in lost income to Grossi as of the date of the instant proceedings.

■ Based on preliminary contacts regarding Grossi's potential coverage under the Travelers policy, Travelers set an initial loss reserve of $1,000.00 for any potential UIM claim.[2] On April 21, 2008, based on his assessment that the value of his losses exceeded $3,300,000.00, Grossi, through counsel, notified Travelers of his demand for payment of the full UIM policy limits of $300,000.00. Grossi's demand included an expert's analysis of his future earnings loss resulting, *inter alia,* from an inability to take over his father's automobile repair business. That loss alone was valued at $4,252,725.00. Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 3, ¶ 12.

Grossi's claim was presented to Travelers' claim adjuster, Roxanne Youndt. Youndt reviewed Grossi's demand and prepared a worksheet for Travelers' Major Claims Unit (MCU). Travelers' claims manual specifies that the worksheet is a tool for "evaluating and reserving uninsured and underinsured motorist claimants." N.T., 10/19–20/11, Plaintiff's exhibit Tab 67, Travelers Liability Best Practices Manual. Youndt valued Grossi's net claim, after deduction of Tarquinio Brothers Bakery's $3,000,000.00 coverage, at about $1,800,000.00. Notwithstanding the Manual's specifications, Youndt's estimate was not based on an independent analysis of Grossi's claim for loss of future earnings.

Without adjusting the $1,000.00 reserve, Youndt transferred Grossi's claim to

1. The parties appeal from the trial court's order entered April 18, 2012, disposing of their cross post-trial motions, wherein the trial court also directed the Prothonotary to enter judgment. However, the certified record contains no indication that the prothonotary complied. We note an appeal generally lies from judgments entered following the disposition of post-trial motions. *Mackall v. Fleegle,* 801 A.2d 577, 580–581 (Pa.Super.2002). However, in the interests of justice and to promote judicial economy an appellate court may "regard as done that which ought to have been done" and proceed in the matter. *See McCormick v. Ne. Bank of Pa.,* 522 Pa. 251, 561 A.2d 328, 330 n. 1 (1989) (holding that although an order dismissing appellants' motion for post-trial relief was not reduced to judgment, in the interests of judicial economy the Supreme Court could "regard as done that which ought to have been done" and proceed with the appeal); *Fanning v. Davne,* 795 A.2d 388, 392 (Pa.Super.2002) (holding that, in the interest of judicial economy, considering appeal from order denying post-trial motions and ordering entry of judgment in favor of plaintiff, even though judgment was not actually entered). We do so here.

2. A loss reserve is an insurer's estimate of future payments on a loss claim. Black's Law Dictionary 1334 (8th ed. 2004).

claims adjuster Andrew W. Makar at Travelers' MCU. On May 22, 2008, Makar responded by letter to Grossi's attorney, expressing the view that Grossi's future earnings loss estimate was "highly speculative," and further expressing an intent to secure an independent medical examination (IME), a vocational expert, and an economist. Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 5, ¶ 20. Makar did not adjust the January 28, 2007 reserve amount of $1,000.00 on Grossi's UIM claim, which remained unchanged throughout the pendency of the claim. Travelers had no further communication with Grossi's counsel explaining the basis for its rejection of his UIM claim. On May 30, 2008, Grossi demanded arbitration. Travelers eventually obtained an IME report on May 7, 2009. Updated reports and other materials in support of his claim were presented to Travelers by Grossi. Travelers, after requesting a continuance of the arbitration hearing, finally obtained a vocational report from its expert, Mark Heckman, although the written report was never made a part of the claims file or reviewed by the adjuster prior to the arbitration hearing.

The UIM claim proceeded to arbitration, on August 6, 2009, resulting in a unanimous gross award in favor of Grossi of $4,000,000.00. Travelers did not appeal the award and promptly paid Grossi the policy UIM limits of $300,000.00, without interest.

On September 29, 2009, Grossi filed a complaint asserting a claim for bad faith under 42 Pa.C.S.A. § 8371. The matter proceeded to a non-jury trial on October 19 to 21, 2011. Subsequently, the parties submitted proposed findings of fact and conclusions of law and presented their closing arguments on January 5, 2012. On January 23, 2012, the trial court announced its findings of fact and conclusions in a memorandum opinion, and issued the following verdict in favor of Grossi.

AND NOW this 23rd day of January, 2012, following a non-jury trial, the Plaintiff has proven by clear and convincing evidence The Travelers Insurance Company acted in bad faith in violation of 42 Pa.C.S.A. § 8371, [the trial c]ourt hereby renders a verdict in favor of Plaintiff, Brandon Grossi, and against the Defendant, Travelers, Inc., and awards damages to Plaintiff pursuant to 42 Pa.C.S.A. § 8371 as follows:

| | | |
|---|---|---|
| (i) | Interest on $300,000.00 underinsured motorist [c]overage from April 21, 2008 to September 11, 2009; | $25,500.00 |
| (ii) | Attorneys fees to McMillen, Urick, Tocci, Fouse & Jones in connection with underinsured motorist claim[;] | $26,875.00 |
| (iii) | Attorneys fees to McMillen, Urick, Tocci, Fouse & Jones in connection with bad faith claim[;] | $120,687.50 |
| (iv) | Costs of bad faith claim[;] | $55,028.44 |
| (v) | Punitive damages[;] | $1,252,325.00 |
| | **TOTAL VERDICT** | $1,480,815.94 |

Trial Court Opinion and Verdict, 1I23I12, at 20–21. The trial court made extensive findings of fact and conclusions of law in support of its verdict. *Id.*

Both parties filed timely post-verdict motions, which the trial court, on April 18, 2012, denied with the exception that it deducted $2,000.00 of the awarded costs from the verdict and ordered the Prothonotary to enter judgment for Grossi in the amount of $1,478,815.94. On May 11, 2012, Travelers filed a timely notice of appeal. On May 17, 2012, Grossi filed a timely notice of cross-appeal. The trial court did not order the parties to prepare concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). On June 11, 2012, this Court, *sua sponte*, consolidated the appeals. *See* Pa.R.A.P. 513.

We begin by addressing the following questions Travelers presents on appeal.

1. Whether the trial court erred as a matter of law in concluding that [ ] Grossi had proven by clear and convincing evidence that Travelers acted in bad faith under 42 Pa.C.S. § 8371 in the handling of his underinsured motorist claim?

2. Whether the trial court erred in denying Travelers' Motions for Entry of Judgment or for New Trial where the conclusion that Travelers acted in bad faith was not supported by findings of fact made by the court or was based upon findings of fact not supported by the record such that the verdict was against the weight of the evidence?

3. Whether the trial court erred by crediting the opinion of [ ] Grossi's bad faith expert that the value of [ ] Grossi's claim exceeded the $3,000,000 set off where that same expert valued the same claim for the tortfeasor at substantially less than the $3,000,000 set off?

4. Whether the trial court erred· as a matter of law in concluding that punitive damages were warranted under the circumstances?

5. Whether the amount of the punitive damages awarded was arbitrary and contrary to law because it was not supported by the evidence, was not reasonably related to the· purposes of punitive damages and was excessive and disproportionate to the conduct?

6. Whether the trial court erred as a matter of law in awarding expert witness fees and costs of litigation which are not recoverable as a matter of law under 42 Pa.C.S. § 8371?

Travelers' Brief at 2.

 · In its first three issues, Travelers avers the trial court erred in denying Travelers' post-verdict motions for judgment notwithstanding the verdict (JNOV) or for a new trial. *See id.* at 22–55. We elect to address these evidentiary issues together. Travelers alleges that critical portions of the trial court's findings of fact are unsupported by the record, and, alternatively, that the trial court's findings do not justify its conclusion that Travelers acted ·in bad faith in evaluating and processing Grossi's UIM claim. *Id.* at 22. When addressing these issues, we adhere to the following standards and scopes of review.

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party ·the benefit of every reasonable inference arising from the evidence and

rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [court] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed.

*Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 568–569 (Pa.Super.2005), quoting *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–305 (Pa.Super.1999) (internal citations omitted).

■ We also note the following principles pertaining to our review of a verdict in an insurance bad faith claim.

Our Supreme Court has long recognized that "the utmost fair dealing should characterize the transactions between an insurance company and the insured." *Dercoli v. Pennsylvania Nat. Mut. Ins. Co.*, 520 Pa. 471, 477, 554 A.2d 906, 909 (1989) (quoting *Fedas v. Insurance Company of the State of Pennsylvania*, 300 Pa. 555, 559, 151 A. 285, 286 (1930)). Moreover, the insurance company has a duty to deal with its insured "on a fair and frank basis, and at all times, to act in good faith." *Id.; Hol-*

*lock v. Erie Ins. Exchange*, 842 A.2d 409, 416 (Pa.Super.2004) [*(en banc)*] (holding that an insurer has a duty to act with the utmost good faith towards its insured)....

In 1990, our legislature created a statutory remedy for bad faith conduct by an insurance company:

§ 8371. Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

In an early case, this Court looked to Black's Law Dictionary to define "bad faith" as "any frivolous or unfounded refusal to pay proceeds of a policy." *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995); *see also Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.1999). In subsequent cases, we have held that to succeed on a claim under section 8371, the insured must show that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *See, e.g., O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (citing *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa.Super.1997)). To constitute bad faith it is not necessary

that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa.Super.2002). *Id.* The insured must also show that the insurer breached a known duty (*i.e.*, the duty of good faith and fair dealing) through a motive of self-interest or ill will. *Id.*

*Berg v. Nationwide Mut. Ins. Co., Inc.*, 44 A.3d 1164, 1170–1171 (Pa.Super.2012).

This Court has noted that the bad faith statute extends to the handling of UIM claims, despite their similarity to third party claims. Also, section 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may extend to the insurer's investigative practices. Bad faith conduct also includes lack of good faith investigation into facts, and failure to communicate with the claimant.

. . .

Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured.

*Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1142–1143 (Pa.Super.2006) (internal quotation marks and citations omitted). Additionally, "[a] trial court may consider the insurer's claims manual when considering bad faith." *Zappile v. Amex Assur. Co.*, 928 A.2d 251, 258 (Pa.Super.2007), appeal denied, 596 Pa. 709, 940 A.2d 366 (2007).

Travelers acknowledges these standards and notes, "while an insurer owes a duty of good faith and fair dealing, an insurer is not required to sacrifice its interest by indiscriminately paying insureds' claims in order to avoid a bad faith lawsuit." Travelers' Brief at 25, *citing Condio, supra* at 1145. Central to the trial court's conclusion that Travelers acted in bad faith in its treatment of Grossi's UIM claim was its finding that Travelers established and maintained only a $1,000.00 reserve throughout the life of the claim, without sufficient justification.

52. On January 23, 2007, Travelers had established a reserve of $1,000.00 on the underinsured claim (meaning a gross value of $1,000.00 due to the tortfeasor set off) which it maintained throughout the pendency of the claim. Travelers maintained this reserve despite the fact that liability was not an issue and there was no comparative negligence reduction; Travelers had paid over $500,000.00 in Act 6 reduced medical bills on the first party claim; [Grossi] had undergone seven surgeries and was permanently disabled, with Travelers making a first party wage loss payment of the limits of $25,000.00. Travelers did not conduct an IME prior to establishing this reserve. Travelers failed to ever increase its reserve or settlement offer, in complete disregard of subsequent medical reports, vocational reports and other documentation (including an updated vocational report with future lost wages as high as $8,000,000.00); thus, throughout the pendency of the underinsured claim, Travelers['] evaluation of the total value of this claim (with the $3,000,000.00 tortfeasor credit) was $1,000.00.

There was no reasonable basis for the $1,000.00 reserve. The $1,000.00 reserve was not reasonable and was reckless in light of the following: 1) clear liability; 2) [Grossi] had seven surgeries and was still treating three years after the accident, 3) the projections of lost earning potential and corroboration of the causal relationship and residual problems by [Grossi's] treating physicians as well as the Travelers IME physician, Dr. Kann.

Trial Court Memorandum Opinion & Findings of Fact, 1/23/12, at 14–15, ¶ 52. Travelers asserts, "[c]ontrary to the ver-

dict reached by the trial court, the facts adduced at trial and indeed accepted by the trial court establish that it was reasonable for Travelers to value [ ] Grossi's UIM claim at less than the $3,000,000[.00] in liability insurance available to the tortfeasor, an amount to which Travelers was entitled as a set off before the UIM limit would be triggered." Travelers' Brief at 22.

In support of its position, Travelers first focuses on the trial court's allegedly contradictory findings relative to Youndt's preparation of the claim worksheet. Travelers argues the trial court's finding, that Youndt did not perform an independent analysis of Grossi's future earnings loss estimate, is inconsistent with its acceptance of the opinion expressed by Harry Paras, Esquire, Grossi's expert witness at the bad faith trial, that Travelers acted unreasonably. *Id.* at 52, *see* Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 21, ¶¶ 13–15. Travelers argues this finding is flawed because Paras based his conclusion on Youndt's worksheet evaluation.

> Having already correctly found that Ms. Youndt did not conduct any evaluation, it was illogical, and flagrantly contrary to the record, for the trial court to then "accept" Mr. Paras' opinion that Ms. Youndt "evaluated" Mr. Grossi's claim at $1.8 million above the $3 million setoff which assumed full value for the future wage loss claim because that claim was not evaluated. This was clear error contrary to the uncontested facts and the trial court's own finding.
>
> . . . Travelers could not possibly have acted unreasonably in disregarding, or failing to make an offer based upon, an evaluation that was not performed.

Travelers' Brief at 27–28.

We conclude Travelers mischaracterizes the trial courts findings and presents them out of context. As noted above, Travelers'

claims manual defined the claim worksheet as a tool for "evaluating and reserving" UIM claims. N.T., 10/19–20/11; Plaintiff's exhibit Tab 67, Travelers Liability Best Practices Manual. We note the fact that Youndt did not perform an independent analysis is not apparent from the worksheet itself, nor does the worksheet directly question the validity of the report by Dr. William Reeds, Grossi's vocational and economic expert, and its estimate of Grossi's future earnings loss. Rather the trial court's finding that Youndt did not perform an independent analysis of Grossi's future earnings loss was based on her affidavit submitted at the October 19–21, 2011 trial. Paras opined that it was unreasonable to prepare a worksheet without an independent review, and it was unreasonable to ignore the worksheet in setting the reserve amount in the absence of any other pertinent information. *See Zappile, supra.*

Accordingly, we do not deem the trial court's findings contradictory. The trial court noted that, given the purpose of Travelers' worksheet, it was reckless for Travelers to prepare the worksheet without an independent evaluation, and having done so, it was further reckless to totally disregard Dr. Reed's estimate to establish a reserve of only $1,000.00 without any basis for doing so.

28. The $1,000.00 reserve by Andrew Makar on May 23, 2008 was not only contrary to the evaluation worksheet performed by Roxanne Youndt, but was an arbitrary figure, with absolutely no relationship to the information Andrew Makar had available to him at the time he performed his evaluation. Mr. Makar failed to articulate any reasonable, rational basis for the low reserve.

In determining the Grossi UIM claim had no value, in excess of [$3,000,-000.00], on May 23, 2008, Andrew Makar

unilaterally decided to discount the projections from Dr. William Houston Reed without any contrary medical or vocational evidence at that time. Makar never offered any explanation as to why he arbitrarily discounted Dr. Reed's projection.

Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 7–8, ¶ 28. Based on the foregoing, we conclude the trial court's findings relative to Youndt's preparation of the claim worksheet and Makar's disregard of that evaluation are supported by the record and its conclusions drawn therefrom are reasonable. Further, we conclude those findings do not preclude the trial court's consideration of Paras' expert testimony that relied in part on that evaluation.

Travelers next argues that the trial court erred in its findings of fact and conclusions that Makar was reckless and unreasonable in failing to credit Grossi's loss of future earnings claim.

> The trial court found unreasonable [ ] Makar's May 23, 2008 refusal to accept [Grossi's vocational expert's] conclusion because he lacked contrary evidence, and faulted him for not setting a reserve or making a settlement offer based upon the truth of that assertion. The trial court's position that Travelers was required to accept the truth of Mr. Grossi's alleged future wage loss claim at the beginning of its investigation is contrary to law and unsupported by the facts.

Travelers' Brief at 29, *citing* the Trial Court's Findings of Fact, 1/23/12, ¶¶ 15, 28, 40, 45, & 47. Travelers insists that, consistent with *Condio*, it was reasonable for Makar to question Grossi's loss of future earnings claim. *Id.*, at 30.

> UIM claims have components of both first party claims and third party claims, and they are inherently adversarial. *Condio*, 899 A.2d at 1145. Although a UIM insurer owes its insured the duty

of good faith and fair dealing, that duty "does [not] require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit." *Id.* at 1145.

> > Because the [insured] was required to prove its legal entitlement to UIM coverage, Erie was not obligated to pay the Estate's claim on demand, no questions asked.

> *Id.* at 1145.

> . . .

> It was wholly reasonable for [ ] Makar to question [ ] Grossi's asserted future wage loss claim. Similarly, it was reasonable for [ ] Makar to set a reserve that did not credit that future wage loss claim. The trial court's finding [ ] that Mr. Makar acted unreasonably because he did not credit the future wage loss claim in his initial claim file analyses and did not set a reserve or make a settlement offer assuming the validity of that claim is flatly contrary to the right of a UIM insurer to question such claim. *Condio*, 889 [899] A.2d at 1145.

*Id.* at 29–30, 32.

When read in its entirety, it becomes evident that Travelers selectively cites from *Condio*. While recognizing that it is proper for an insurance company to protect its interest in a UIM claim from its insured, the *Condio* Court made clear that to act in good faith an insurer "could not withhold payment of the UIM claim absent a reasonable basis for doing so." *Condio*, *supra*. Instantly, Travelers asserts its reasonable basis for rejecting Grossi's future earnings loss claim was "because allegations of future wage loss are inherently speculative." Travelers' Brief at 31. "[ ] Makar was not required to blindly' accept [ ] Grossi's assertion of a future wage loss . . ." *Id.*

As recognized by the trial court, however, it was not reasonable for Travelers to "blindly" reject Grossi's future earnings loss claim. Trial Court Memorandum Opinion & Findings of Fact, 1123112, at 24, ¶ 28. Here, Travelers had Grossi's expert's report and estimate, and its worksheet reflecting those figures, albeit without the internally requisite independent analysis. We agree with the trial court that Makar's discounting of that information, without "articulat[ing] any reasonable, rational basis for the low reserve," was unreasonable. *Id.* To accept Travelers' position would justify rejection of any UIM claim simply on the basis of an inherent uncertainty when estimating damages, without engaging in any particularized analysis or investigation of the individual claim. Such a practice cannot fulfill an insurer's duty of good faith and fair dealing. *See Berg, supra.*

Travelers next asserts that the record does not support the trial court's findings and conclusions that Travelers' efforts to secure its own experts to investigate and evaluate Grossi's claim were unreasonable. Travelers' Brief at 34. The trial court determined that, having articulated a desire to obtain its own IME, vocational expert, and economist on May 22, 2008, there was no justification for waiting over a year to perform the IME and secure a vocational report. Trial Court Memorandum Opinion & Findings of Fact, 1123112, at 8, ¶ 29.

44. Between April 21, 2008 and April 28, 2009, Travelers, as well as Travelers' in-house counsel, did not retain a vocational expert, did not conduct an IME, and failed to take other affirmative steps to investigate [Grossi's] claims.

*Id.* at 12–13, ¶ 44.

The trial court found that Travelers was not justified in postponing an independent evaluation while it monitored Grossi's third party claims. *Id.* at 8–9, 12, ¶¶ 31, 43. The trial court also found troubling that, after the report of Mark Heckman, Travelers' vocational expert, was prepared on June 25, 2009, the following circumstances ensued.

(i) There are no Travelers' claims notes that discuss the Heckman vocational report.

(ii) There are no Travelers' claims notes that acknowledge the existence of the Heckman vocational report.

(iii) A copy of the Heckman vocational report is not contained in the Travelers' claims file.

(iv) Heckman's Report questions Brandon Grossi's capability to run the Grossi automotive business.

*Id.* at 10,$35.

The trial court further found the following.

38. Makar did not offer any explanation as to why he did not review the Heckman report or possess a copy of the report. Makar did however attempt to shift the blame to Travelers' in-house counsel for the delay in arranging for the expert evaluations, but was unable to attribute a credible reason of why he did not have the Heckman report or why he did not obtain it from Travelers' in-house counsel.

*Id.* at 11, ¶ 38.

Additionally, the trial court noted that Travelers never secured a report from an economist after having specified the need to do so. *Id.* at 8, ¶ 29. Travelers responds, that the reports from Dr. Kann and Heckman provided a basis for its position that Grossi's claim, including lost future earnings, would not exceed the $3,000,000.00 set off. Travelers' Brief at 37. "[T]hese undisputed facts also reveal [the trial court's findings of fact nos.] 35, 37 and 38 to be illogical and capricious." *Id.* Travelers cites *Johnson v. Progressive Ins. Co.,* 987 A.2d 781 (Pa.Super.2009) as

"holding [an] insurer was not in bad faith for obtaining an IME which disputed the medical opinion of the insured's physician and provided a reasonable basis for the value it placed on the insured's damages." Travelers' Reply Brief at 17. Contrary to the facts in this case, the insurer in *Johnson* completed its IME within three months of receiving Johnson's medical records and only thereafter determined to proceed with arbitration. *Johnson, supra* at 782–783. Here, Travelers did not base its valuation of Grossi's claim, its setting of a reserve, or its decision to proceed with arbitration on the IME of Dr. Kann, or the vocational report by Heckman, which Makar had not even seen prior to arbitration. Accordingly, we conclude the record supports the trial court's findings and conclusions that Travelers' efforts to obtain an independent evaluation of Grossi's claim were unreasonable and were motivated by self-interest.

Next, Travelers maintains that its delay in pursuing its investigation of Grossi's claim in this case "was not unreasonable as a matter of law." Travelers' Brief at 41. "Although it took some time for [ ] Makar to obtain the independent expert evaluation of [ ] Grossi's alleged future wage loss claim, a delay in retaining experts attributable to a need to investigate further is not bad faith, even if it could be characterized as negligent." *Id.* at 42. This Court has articulated the relationship between an insurer's duty to act in good faith and its need to investigate claims.

> The Unfair Insurance Practices provision in the Pennsylvania Code, 31 Pa. Code § 146.6, provides the following:
>
> > § 146.6. Standards for prompt investigation of claims. Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every

45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

Moreover, in *Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 415 (Pa.Super.2004) *(en banc)*, this Court opined that "the broad language of Section 8371 was designed to remedy all instances of bad faith conduct by an insurer's, whether occurring before, during or after litigation. Therefore, we acknowledge ... that [a]n action for bad faith may also extend to the insurer's investigative practices[.]" *(quoting O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999)). Implicit in *Hollock's* holdings is the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured. *See Condio v. Erie Insurance Exchange*, 899 A.2d 1136 (Pa.Super.2006) (holding that bad faith includes lack of good faith in investigating the facts of a complaint). *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 92–93 (Pa.Super.2007); *see also Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa.Super.2004) (stating, "[b]ad faith conduct also includes 'lack of good faith investigation into fact[s], and failure to communicate with the claimant[ ]' "), quoting *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994).

While the length of time Travelers took to investigate is not *per se* bad faith, it is a factor for the trial court to consider when looking at all the circumstances of the case. Instantly, providing the context in which to consider that factor, the trial court faulted Travelers for (1) not performing an initial independent analysis in its worksheet per its own manual; (2) delaying its investigation while it monitored

the third party action, when that action was independent of the UIM claim; (3) rejecting Grossi's future earnings loss claim and expert's opinion and setting an arbitrarily low reserve without any other basis for doing so; (4) committing to arbitration without having commenced its investigation; and (5) failing to communicate adequately with Grossi or explain its rejection of his claim. Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 17–18. These factors support the trial court's conclusion that Travelers' investigation proceeded in bad faith, not merely because of the delay, but because there were, *inter alia,* inexcusable periods of inactivity, unreasonable assumptions, and inadequate communication.

■■■ Travelers asserts, "[a]s both Mr. Grossi's counsel and expert agreed, arbitration is an adversarial process that takes time." Travelers' Brief at 45. This only highlights the inadequacy of Travelers' basis for rejecting Grossi's claim before it committed to arbitration. Rather, Travelers developed its own independent information, not to review or justify its denial of Grossi's claim and establishment of a low reserve, but to prepare for arbitration. Accordingly, we conclude the trial court did not err in considering Travelers' delay in effectuating its investigation as supporting its conclusion that Travelers acted with bad faith.

Travelers also makes a general argument that the trial court's findings are against the weight of the evidence presented at trial. Travelers' Brief at 23. In reference to most of these findings, Travelers points to possible contrary inferences derivable from the evidence presented and the evidence presumably discounted by the trial court. Addressing a similar argument, this Court explained as follows.

> In this case, [insurer] concedes that it decided not to pay [claimant's] UIM claim on the basis of its adjuster's deter-

mination of valuation and its dispute concerning the cause of [claimant's] injuries. Unlike the considerations of unsettled law at issue in *Terletsky* both of these points of dispute are inherently factual and are subject to the trial court's determination of credibility. Unlike the circumstances in *Terletsky* there is no point of law raised in this case on which [insurer] can rely to preclude a showing of bad faith. [Insurer's] offer of evidence in support of its position that it acted reasonably, was specifically rejected by the trial court acting as factfinder. The trial court concluded, based upon its specific factual findings and credibility determinations, that [insurer] did not act reasonably in investigating, evaluating and paying [insured's] claim. [Insurer's] recitation of its own countervailing evidence which was not accepted by the trial court cannot undermine [insured's] proof of bad faith.

*Hollock v. Erie Ins. Exch.,* 842 A.2d 409, 417 (Pa.Super.2004) (*en banc* ), *appeal dismissed,* 588 Pa. 231, 903 A.2d 1185 (2006). We determine these principles apply here and the trial court's credibility determinations will not be disturbed.

In particular, Travelers declares it was error for the trial court to credit the testimony of Paras, Grossi's bad faith expert. Travelers' Brief at 52.

> [ ] Paras's credibility and therefore his opinions should have been rejected by the court for an independent reason. [ ] Paras was retained by counsel defending the tortfeasor, Tarquinio, and was asked to provide his evaluation of the value of [ ] Grossi's damages based upon the same information submitted to Travelers. [ ] Paras evaluated [ ] Grossi's total damages, including the future wage loss claim, at between $750,000 and $1.2 million, an amount even less than the amount at which [ ] Makar valued [ ]

Grossi's claim. Astonishingly, having provided an opinion for the tortfeasor, in whose shoes Travelers effectively stepped for purposes of liability, that [ ] Grossi's damages were far less than $3 million, [ ] Paras, for a fee, gave [ ] Grossi's counsel in this case a completely inconsistent opinion that [ ] Grossi's damages exceeded the $3 million limit of the tortfeasor's coverage and that it was unreasonable for Travelers not to make and [sic] offer and to leave the reserves at $1,000. This blatant conflicting testimony left [ ] Paras with no credibility, and it was an abuse of discretion for the court to credit it at all.

*Id.* at 53 (citations to record omitted).

In his testimony, Paras explained the different context and purpose of the opinions he expressed in the instant case and the third-party action.

> [Travelers' Counsel]: And you provided an evaluation of Mr. Grossi's claim in the third party case, didn't you?

> [Paras]: Well, let me explain what I was asked to do. I was informed, I was given materials in the underlying case, and I was informed that there was a 1 million dollar policy limit. I was not aware that there was any kind of excess policy until Mr. McMillen approached me and Attorney Tocci approached me about this case. It was put to me that, "We want to know what would be a reasonable settlement value of this case, and we'd like you to take a look at certain materials," and I did. And I was asked to—

> . . .

> THE WITNESS: I was asked to look at them and put that number on with the—I was not aware . . . that there was any pending UIM. . . . I was told that, "Would you please put some numbers on the reasonable, a reasonable settlement value for this case driven by the fact

that is it above or under a million bucks?"

N.T., 10I20I12, at 420–421.

On redirect examination from Grossi's counsel, Paras further clarified as follows.

Q. And the figure that you gave, was that a settlement figure, or was that a verdict potential?

A. I think that was a settlement figure, may have been some kind of a verdict range, settlement figure, combination of both.

Q. Did you have an upper end of your predicted potential verdict range when you looked at those materials that you conveyed to [Tarquino's counsel]?

A. Yes.

Q. And what was that?

A. I told her that because the averages were going to go on the board in excess of 4 million dollars that there was a chance that if all went well for the Plaintiff that there could be a verdict anywhere from 3 to 4, to 4 to 5 million dollars, upper, upper end range.

*Id.* at 437.

Thus, the opinions Paras was tasked with providing were not comparable or inherently contradictory. We therefore conclude the trial court did not abuse its discretion in finding credible, Paras' opinion relative to whether Travelers acted in bad faith. After a thorough review of the record relative to Travelers' general challenge to the weight of the evidence, we cannot conclude the trial court abused its discretion or that its findings shock the conscience. The evidence and credibility determinations of the trial court find support in the record and we will not substitute our judgment therefor. Accordingly, Travelers' weight of the evidence claims fail.

Next, Travelers proposes that this Court's decision in *Brown* should control the outcome of this case. Noting multiple similarities between the two cases, Travelers avers, "[l]ike the situation in *Brown*, here "the record does not support with clear and convincing evidence the trial court's conclusion that [the insurer] failed to properly evaluate the claim." Travelers' Brief at 55, *quoting Brown, supra* at 502. In *Brown*, however, we held there was no evidence in the record suggesting that Brown's claim was worth more than [the limit of third party policy limit plus the amount of the UIM settlement] … no facts were ever developed as to the true value of Brown's claim." *Brown, supra* at 503. Instantly, the record discloses that Travelers had received Grossi's expert report when it rejected the claim without any independent information to counter those conclusions, and the arbitrators eventually valued Grossi's claim, after offset, at $1,000,000.00. *See Hollock, supra* at 412 (determining settlement offer 29 times lower than arbitration award is evidence of bad faith). Accordingly, we conclude *Brown* is distinguishable and does not compel a reversal of the trial court's verdict. For all the foregoing reasons, we conclude Travelers' first three issues challenging the sufficiency and the weight of the evidence lack merit. We discern no error or abuse of discretion by the trial court in denying Travelers' motions for new trial or JNOV. *See Wilson, supra.*

■ In its fourth and fifth issues, Travelers avers the trial court erred in its imposition of punitive damages in this case. Travelers' Brief at 55, 57. We begin our review of these issues by noting that punitive damages under 42 Pa.C.S.A. § 8371 are permissible within the discretion of the trial court upon a showing of bad faith.

Section 8371, which creates the cause of action for insurance bad faith, specifi-cally empowers the trial court to award punitive damages "if the court finds that the insurer has acted in bad faith toward the insured[.]" 42 Pa.C.S.A. § 8371. The statute provides no other language suggesting a precondition for the award of punitive damages. Thus, by statutory mandate, a finding of bad faith is the only prerequisite to a punitive damages award under section 8371. Moreover, this Court has suggested that the elements of proof necessary to establish a claim for punitive damages under this section are coextensive with those that establish the bad faith claim itself…. [A] finding of bad faith does not compel an award of punitive damages, it does allow for the award without additional proof, subject to the trial court's exercise of discretion. *See* 42 Pa.C.S.A. § 8371.

*Hollock, supra* at 418–419 (some citations omitted, emphasis in original).

■ In asserting that no punitive damage award was warranted, Travelers states that "[t]he 'character of the act' here does not justify any award of punitive damages. The trial court did not find that Travelers acted with any malice or dishonest purpose." Travelers' Brief at 56. Travelers attempts to parse findings of bad faith into degrees, which may or may not justify imposing punitive damages. As made clear by this Court in *Hollock*, no additional showing beyond establishing bad faith conduct under section 8371 is required to permit the imposition of punitive damages. In the balance of its argument against any imposition of punitive damages, Travelers essentially reiterates its earlier contentions that the evidence does not support a finding of bad faith. "It cannot be unreasonable or in bad faith for a UIM claims adjuster to seek all information available on the nature of the insured's damages, including reports and IMEs being conduct-

ed in the insured's action against the tortfeasor." *Id.* As discussed above, these arguments afford Travelers no relief.

 Alternatively, Travelers argues that even if an award of punitive damages is permitted, the amount awarded by the trial court in this case "was not reasonably related to the interests of punishment or deterrence, and must be vacated or reduced." *Id.* at 58. This Court has articulated the considerations a trial court must bear in mind when determining an appropriate amount of punitive damages under section 8371.

> Under Pennsylvania law the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion. In accordance with this limitation, [t]he standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant.

*Hollock, supra* at 419 (internal quotation marks and citations omitted). We review such an award for an abuse of discretion. *Id.* at 420. In addition, in the face of a constitutional challenge, we conduct a de novo review "to determine whether it comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.*

> "Because punitive damages pose an acute danger of arbitrary deprivation of property, due process requires judicial review of the size of punitive damage awards." [*Pioneer Commercial Funding Corp. v. American Financial Mortg. Corp.*, 797 A.2d at 292.]
>
> In *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585, the United States Supreme Court reviewed a $145 million punitive damages award.

Finding that the award was excessive and disproportionate to the wrong committed, the Court ruled it constituted an unconstitutional deprivation of the insurer's property. The Court noted that, although states possess discretion over the imposition of punitive damages, there are procedural and substantive constitutional limitations on these awards. *Id.* at 1519. The Court cautioned that the due process clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments. *Id.* at 1520. While finding that punitive damages are aimed at deterrence and retribution, *id.* at 1519, the United States Supreme Court advised reviewing courts to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 1520, (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 560–61, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

> The Court in *Campbell* reiterated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 123 S.Ct. at 1521.

*Hollock, supra* at 420–421.

Travelers argues that the trial court's findings do not reveal its reasoning or its application of the foregoing factors in its determination of the amount of the punitive damage award in this case. Travelers' Brief at 60. Travelers advances two bases for its challenge that the amount of the punitive damage awarded is erroneous and excessive. First, based on comments made by the trial court at arguments on post-trial motions, Travelers alleges the

trial court "had a compensatory purpose in mind." *Id.* at 58. Travelers further avers such purpose is improper.

> Here, the *punitive damage award was calculated to compensate Mr. Grossi for his alleged lost future wages*, rather than to punish Travelers for bad faith conduct or deter insurers from future bad faith conduct. Such damages are contrary to the well-established purpose of punitive damage awards and are not permissible under 42 Pa.C.S. § 8371.

*Id.* at 60.[3]

The referenced statements by the trial court at argument were made during Travelers' argument relative to its claim that Grossi had not established bad faith and in response to Grossi's counsel's discussion of the appropriate compensatory base to apply a multiplier to review the constitutionality of the award. The trial court's comments were not intended as a full explanation of its assessment of the appropriate amount of punitive damages. *See* N.T., 4/11/12, at 20, 43. Accordingly, we do not conclude the statements reveal an intent by the trial court to assess punitive damages for the purpose of compensating Grossi as opposed to tailoring the punitive damages to the severity of the particular circumstances of this case, including the value of Grossi's underlying claims discounted by Travelers.

Second, Travelers contends that the trial court's punitive damage award is dispro-

portionate to the severity of Travelers' actions in this case, and that the award is unconstitutional or the result of the trial court's abuse of discretion. Travelers' Brief at 57.

> For the same reasons addressed in [Travelers' argument that its actions did not justify any award of punitive damages], the character of the acts cited by the trial court does not justify the size of the award, approximately 5 times "compensatory." First, the absence of any dishonest purpose, ill-will or deliberate indifference renders the amount of the award, arbitrary. Second, the trial court failed to identify any harm to Mr. Grossi. Travelers paid its UIM limits following the award, Mr. Grossi was awarded interest and attorneys' fees. Consequently, an award of $1,252,725 was not reasonably related to the interests of punishment or deterrence, and must be vacated or reduced.

*Id.* at 58.

Although the trial court has not provided this Court with its specific mathematical application of the above-cited factors, our review discloses that the award is sufficiently supported by the record and the trial court's individualized findings of fact. We discern no abuse of discretion or constitutional impropriety. Specifically, with respect to the "character" or "degree of reprehensibility" of Travelers' misconduct, Travelers, citing *Campbell*,[4] avers that its

---

**3.** The trial court's remarks alluded to by Travelers were as follows.

> THE COURT: Okay. So, [the UIM arbitrators] knocked off 2 million. They gave you 4.... That's why I, when I tailored the damages in this case, I tailored the damages between the credit and what they awarded. I think that's obvious when you look at the calculation. It's the attorneys' fees and costs that changed the amount.

N.T., 4/11/12, at 20.

> THE COURT: I will admit for the Record that I didn't use any multiple in arriving at

[the punitive damage award]. What I did was: I took the difference between the wage loss-I think it was, the difference comes out to 1 million, 200 and some thousand dollars. I took that, and I think what I did was gave you the difference between what you-I don't think I used a multiple, but even a multiple, if you use a multiple, it's only 5 times.

*Id.* at 43.

**4.** The factors set forth in *Campbell* are as follows.

conduct was not so severe as to justify the trial court's measure of punitive damages.

An analysis of these reprehensibility factors establishes the arbitrariness and excessiveness of the punitive damages award, rendering it constitutionally defective. The harm was not physical, there is no finding that the act evinced a reckless disregard for the health and safety of others, there was no evidence that the conduct involved repeated actions by Travelers, and the trial court found no malice, trickery or deceit. Four of the five factors weight heavily in favor of finding the amount of the award excessive or arbitrary. As to the remaining factor, absent from the trial court's opinion is any indication that Mr. Grossi was financially vulnerable. In sum, weighing all of these factors shows the amount of the award to be excessive, and it should be vacated or reduced.

*Id.* at 61.

■ Travelers makes much of the fact that the trial court, in its findings of fact, did not assign stronger adjectives to its conduct than "arbitrary," "unreasonable," and "reckless." *Id.* at 61. However, we believe the litany of repeated acts of bad faith described by the trial court in its findings brings its conduct well within the degree of reprehensibility justifying the punitive damages awarded here.

As recited above, the severity of Grossi's injuries was undisputed, resulting in seven surgeries by the time of the bad faith hearing and up to $500,000.00 paid by Travelers in first party medical expense payments. Upon receipt of Grossi's UIM claim, complete with documentation and expert opinions, Travelers' adjuster failed to perform any independent analysis in accordance with its own manual in her preparation of the claim worksheet. Travelers' subsequent adjuster summarily rejected Grossi's future earnings loss claim and the expert reports supporting it without any independent evidence, analysis, or reports other than a belief that all such claims are inherently speculative. Then, yielding to its own self-serving speculation, and contrary to the only factual and expert information then available, Travelers assumed a value below its offset and established only a minimal reserve. Travelers then delayed obtaining the independent expert reports it professed to need for over a year, unjustifiably waiting for resolution of Grossi's third party claim. Travelers had minimal communication with Grossi concerning the basis for its rejection and proceeded toward arbitration persisting with its unsupported rejection of Grossi's claim. Finally, receiving an independent vocational report in time for the arbitration hearing, Travelers' adjuster failed to obtain the written report or maintain the same in the claim file.

The trial court found these actions were motivated by Travelers' "self-interest" in breach of its duty to act in good faith toward Grossi. Trial Court Memorandum Opinion & Findings of Fact, 1I23I12, at 17–18. These findings represent repeated, intentional, self-interested, bad faith conduct on the part of Travelers toward its insured with reckless disregard to his undisputedly severe and permanent physical

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell, supra* at 419, 123 S.Ct. 1513 citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576–577, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)

injury, which exposed him to financial vulnerability. Travelers' attempt to minimize the seriousness of its conduct is not availing.

■ With respect to the nature and extent of the harm and disparity between the actual or potential harm suffered by Grossi and the punitive damages award we note that "the United States Supreme Court has expressly rejected the assertion that a punitive damages award must bear a certain proportionality to the amount of compensatory damages." *Hollock, supra* at 421, *citing Campbell, supra.* Rather it has urged that review of "the ratio of punitive damages to the harm caused by the Defendant is a tool to ensure that the two bear a reasonable relationship to each other." *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.,* 399 F.3d 224, 233–234 (3d Cir.2005). "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1." *Campbell, supra* at 425, 123 S.Ct. 1513 (citations omitted).

The award of punitive damages by the trial court in this case approximates a ratio of punitive damages to compensatory damages of 4:1, or 5:1, depending on the measure of compensatory damages.[5] Travelers' Brief at 62; Grossi's Brief at 32. The parties present competing arguments relative to what figures should be considered "compensatory damages" when calculating this ratio. Grossi avers "[i]t is appropriate to utilize the [$300,000.00] contract award under the policy, attorneys['] fees and interest as the basis upon which to apply a proper ratio for calculation of a punitive damage award." Grossi's Brief at 32. Travelers counters as follows.

However, this [C]ourt has made clear that the figure that must be utilized for comparison purposes. for determining whether an award of punitive damages is constitutionally excessive is the total of the "attorneys' fees, costs and interest" awarded in the bad faith action pursuant to 42 Pa.C.S. § 8371. *Hollock,* 842 A.2d at 421–22. Thus, the UIM limits are irrelevant to the constitutionality of the award.

Travelers' Reply Brief at 29 n. 20.

■ In *Hollock,* this Court noted "the compensatory damages in the bad faith action were limited to attorneys' fees, costs and interest." *Hollock, supra* at 422. However, as noted, our reference to a ratio is not an end in itself, but a tool to insure reasonableness. In that context the Court in *Campbell* explained "the precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell, supra* at 425, 123 S.Ct. 1513. Additionally, this court has recognized that Pennsylvania's statutory bad faith action presents a scenario distinct from those considered in *Campbell. Hollock supra* at 421–422. In a bad faith action, compensatory damages are limited to fees, expenses and interest, which are removed from the underlying contractual action where the insured's loss claim is at risk from the insurer's conduct. That results in a relatively low compensatory damage measure, which may justify a higher ratio of punitive damages in consideration of total harm.

As noted in *Hollock,* the *Campbell* Court allowed for variation in relation to the nature of the compensatory award. *Id.* The large compensatory award in *Campbell* was viewed by the Court as reducing the need to award a large

---

**5.** The ratio will be modestly higher in light of our disposition of Travelers' final issue challenging the trial. courts' inclusion of expert witness fees.

amount of punitive damages to provide an effective remedy. However, where the compensatory award is small in spite of the defendant's egregious conduct, it may be appropriate to award a larger amount of punitive damages.

*Id.* at 421 (citation omitted). Under circumstances similar to the instant case, this Court in *Hollock* determined that a 10:1 ratio between the compensatory damages awarded in a bad faith action and the punitive damages awarded was appropriate and constitutional. *Id.* at 422. Accordingly, under the circumstances of this case, we discern no abuse of discretion or constitutional infirmity in the trial court's award of punitive damages in this case.

With respect to wealth of the defendant and the relation to potential civil penalties, Travelers has provided no basis to conclude that the award is excessive against the measure of such factors. Indeed, the punitive damage award in this case is comparable to that approved by this Court in *Hollock*. Again, we discern no abuse of discretion or constitutional excessiveness in the punitive damage award in this case.

 In its final issue, Travelers submits that the trial court erred as a matter of law by including certain expert witness fees into its award of costs under section 8371. Travelers' Brief at 63.

In reviewing an award of costs, the lower court's conclusions of law are subject to plenary review under a *de novo* standard but, where the lower court's authority to award costs is clear, we are limited to determining only whether the court "palpably abused its discretion" in levying costs.

*In re Farnese*, 609 Pa. 543, 17 A.3d 357, 367 (2011) (citation omitted).

Travelers argues that section 8371, in permitting the trial court to assess "court costs," does not permit inclusion of "expert witness fees, arbitration fees, investigation fees and other trial preparation expenses and fees that are not recoverable costs under 42 Pa.C.S. § 8371." Travelers' Brief at 63. Grossi, urges this Court to take a less restrictive interpretation of "court costs" in light of the policy considerations underlying section 8371.

However, § 8371 exists to protect consumers from bad faith denial of insurance benefits and does not specifically limit what costs are awardable. Though the right to make a claim for bad faith is permitted by statute, the carrier's duty to act in good faith arises from its insurance contract. To truly put a wronged insured in the same place they would have been if not for the carrier's breach of its obligation to act in good faith, all expenses incurred in pursuing the UIM claim and bad faith claim must be awarded. If the insurance carrier were not held accountable for costs associated with the pursuit of these claims, the deterrent purpose of punitive damages awarded under the act and the intended protection of insureds would be greatly undermined.

Grossi's Brief at 33.

Consequently, we must inquire into the legislature's intent relative to the meaning of "court costs" in the context of section 8371.

The object of statutory interpretation is to determine the intent of the General Assembly. The touchstone of statutory interpretation is that where a statute is unambiguous, the judiciary may not ignore the plain language "under the pretext of pursuing its spirit," 1 Pa.C.S. § 1921(b), for the language of a statute is the best indication of legislative intent. Words and phrases should be construed in accordance with their common and approved usage. 1 Pa.C.S. § 1903(a). When the words of a statute are clear, there is no need to look beyond the plain meaning of a statute. If

a statute is deemed ambiguous, however, resort to principles of statutory construction is appropriate. 1 Pa.C.S. § 1921(c).

*Colville v. Allegheny Cnty. Ret. Bd.*, 592 Pa. 433, 926 A.2d 424, 430–431 (2007) (some internal quotation marks and citations omitted).

Instantly the meaning of the term "court costs" has long been understood and established by case law. "Thus, case law indicates that the common and approved meaning of 'costs' is 'court costs' or 'docket costs.' If recovery of other costs is to be awarded from the unsuccessful party, there must be statutory authority for doing so." *Gregory v. Harleysville Mut. Ins. Co.*, 374 Pa.Super. 33, 542 A.2d 133, 136 (1988). Here the legislature employed a well-understood term in permitting an award of costs, and we cannot expand that meaning in the name of pursuing the spirit of the statute. *Colville, supra.*

Indeed, as Travelers points out, in other contexts where the legislature has intended to permit the awarding of expert witness fees, it has expressly so provided. *See, e.g.,* 3 P.S. § 1406 (authorizing the trial court, in an action for failure to pay interest on a late payment to a chicken or egg producer, to "award costs of litigation (including attorney and expert witness fees)"); 35 P.S. § 6021.1305(f) (authorizing the trial court, in an enforcement action under the Storage Tank and Spill Prevention Act to "award costs of litigation (including attorney and expert witness fees) to any party"); 73 P.S. § 2105 (authorizing the trial court, in an action under the Fine Arts Preservation Act to obtain "[r]easonable attorney and expert witness fees").

Accordingly, we determine the plain language of section 8371 does not permit recovery of expert witness fees in an award of "court costs." We further conclude the trial courted erred in awarding Grossi such costs in the instant case. The trial court based its cost award on Grossi's Trial Exhibit 9 itemizing his costs totaling $55,028.44.[6] N.T., 10/19–20/11, Plaintiffs' Exhibit 9. We agree with Travelers' assessment that after deletion of Grossi's expert witness fees, "the verdict should be molded to reflect an assessment of costs of $2,729.66." Travelers' Brief at 67, see N.T., 10/19–20/11, Plaintiff's Exhibit 9.

We next turn to the issues raised by Grossi in his cross appeal. Grossi stated those issues as follows.

[1.] Did the trial court err and/or abuse its discretion in calculating interest on the $300,000 underlying UIM coverage rather than the $4 million arbitration award?

[2.] Did the trial court err and/or abuse its discretion in allowing hearsay testimony concerning an oral summary of Travelers['] vocational expert report that was purportedly made to its adjuster by in-house counsel?

Grossi's Brief at 2.

■ Grossi first faults the trial court's use of Grossi's UIM coverage of $300,000.00 as the "amount of the claim" in its calculation of interest pursuant to section 8371(1). *Id.* at 36. "[Section] 8371 does not define 'claim' and there is no basis to limit its meaning by the applicable coverage. Rather, the 'amount of the claim' is more appropriately represented by the value of the insured's damages, not the amount of the coverage ultimately paid." *Id.* "Guidance on this issue is found in the Superior Court's decision in *Mar-*

---

6. As noted above, the trial court deducted $2,000.00 from this figure in partial grant of Travelers' post-verdict motion.

*lette v. State Farm [Mut. Auto Ins. Co.]*, 10 A.3d. 347 ([Pa.Super.]2010)[, *vacated,* —— Pa. ——, 57 A.3d 1224 (2012)]" (*Marlette I*). *Id.* at 37.

In *Marlette,* this Court held, in an uninsured motorist claim, an award of delay damages pursuant to Pa.R.C.P. 238 should be measured from a plaintiff's total verdict award and not merely from the contractual policy limits. *Marlette I, supra* at 355. However, after Grossi filed his brief, our Supreme Court issued an opinion vacating this Court's decision in *Marlette I. Marlette v. State Farm Mut. Auto. Ins. Co.,* —— Pa. ——, 57 A.3d 1224 (2012) (*Marlette II*). In overturning *Marlette I,* our Supreme Court held "that a plaintiff's recovery of delay damages under Pa.R.Civ.P. 238 is limited to the amount of the legally-recoverable molded verdict as reflected by the insurance policy limits." *Id.* at 1230. The Court in *Marlette II,* however, noted that its ruling applied "absent bad faith." *Id.*

■■■ Under the circumstances of this case, we need not address the impact of the *Marlette II* decision on interest awarded in a bad faith claim pursuant to 42 Pa.C.S.A. § 8371(1). As this court has previously recognized, the awarding of interest pursuant to section 8371(1) is permissive, providing that the trial court "may" award interest in a bad faith case. *Zimmerman v. Harleysville Mut. Ins. Co.,* 860 A.2d 167, 174 (Pa.Super.2004). Contrastingly, under the Pennsylvania Rules of Civil Procedure, a trial court "shall" grant delay damage interest to a qualified petitioner. *See* Pa.R.C.P. 238.

Pursuant to section 8371 of title 42, a court may award interest, attorney's fees and costs where the insurer has been found to have acted in bad faith towards its insured. However, such an award is within the discretion of the trial court. An abuse of discretion is not merely an error of judgment, but if in

reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused. When determining whether the trial court abused its discretion, [t]he test is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Zimmerman, supra* at 174–175.

Accordingly, even if the language of section 8371 permits a trial court to calculate interest on an entire verdict as opposed to only the policy limits for a UIM claim, it is not required to do so. Instantly, Grossi, has not demonstrated and we do not discern that the trial court's award of interest on the $300,000.00 UIM coverage limit constitutes an abuse of discretion in this case.

In his final issue, Grossi challenges the trial court's admission of certain evidence at trial over his hearsay objection. Grossi's Brief at 38–39. Grossi contends that our determination of whether the trial court's finding of bad faith is supported by the record should not include consideration of the allegedly objectionable evidence. *Id.* In light of our disposition of Travelers' issues challenging the trial court's bad faith determination, we need not address this now moot evidentiary issue.

In conclusion, we reject Travelers' contention that the trial court's findings and conclusions are not supported by the record or that they do not justify the trial court's conclusion that Travelers acted in bad faith toward Grossi's UIM claim. We further reject Travelers' assertion that the punitive damage award in this case was fashioned for a compensatory purpose or

that it is unconstitutionally disproportionate to the character of Travelers' bad faith behavior or the award of compensatory damages. We also reject Grossi's position that the trial court erred or abused its discretion in awarding interest on the $300,000.00 UIM claim, rather than the entire arbitration award. We, however, agree with Travelers that the trial court erred as a matter of law in awarding Grossi's expert witness fee expenses as recoverable costs under section 8371. Accordingly, we direct the trial court to mold the costs portion of its verdict to reflect an award of $2,729.66. In all other respects the trial court's verdict and judgment is affirmed.

Judgment affirmed in part and vacated in part. Case remanded with instructions. Jurisdiction relinquished.

Judge BOWES files a dissenting opinion.

## DISSENTING OPINION BY BOWES, J.:

In my view, some of the trial court's factual findings are in irreconcilable conflict. Additionally, I find that the trial court's factual findings do not support its legal conclusions. Thus, I believe that the evidence cannot sustain a finding, by clear and convincing evidence, that Travelers Personal Insurance Company ("Travelers") handled the underinsured motorist claim ("UIM") filed by Brandon P. Grossi, in bad faith. Further, I would hold that Travelers is entitled to judgment notwithstanding the verdict ("n.o.v."). I therefore respectfully dissent to the learned majority's decision to affirm.

When we examine the propriety of the trial court's denial of judgment n.o.v.,

> we must determine whether there is sufficient competent evidence to sustain the verdict. We will review all of the evidence in the light most favorable to the verdict-winner and will give that party the benefit of every reasonable inference arising from that evidence while rejecting all unfavorable testimony and inferences. Judgment n.o.v. may be entered where: (1) the moving party is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered for the moving party. Our scope of review is plenary concerning any questions of law.

*Renna v. Schadt*, 64 A.3d 658, 669 (Pa.Super.2013) (quoting *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa.Super.2004)).

Mr. Grossi's cause of action herein arose under 42 Pa.C.S. § 8371, actions on insurance policies, which outlines a remedy for bad faith conduct by an insurance company and provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

The definition of "bad faith" conduct by an insurer has been defined as follows:

> In an early case, this Court looked to Black's Law Dictionary to define "bad faith" as "any frivolous or unfounded refusal to pay proceeds of a policy." *Terletsky v. Prudential Property and Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995); *see also Adamski v. Allstate Ins. Co.*, 738 A.2d

1033, 1036 (Pa.Super.1999). In subsequent cases, we have held that to succeed on a claim under section 8371, the insured must show that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *See, e.g., O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (citing *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa.Super.1997)). To constitute bad faith it is not necessary that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa.Super.2002). *Id.* The insured must also show that the insurer breached a known duty (*i.e.*, the duty of good faith and fair dealing) through a motive of self-interest or ill will. *Id.*

*Berg v. Nationwide Mut. Insurance Co., Inc.*, 44 A.3d 1164, 1171 (Pa.Super.2012).

Bad faith is not present when the insurer makes a low, but factually reasonable, assessment of the insured's damages. *Id.; Terletsky, supra.* In *O'Donnell, supra* at 910, we noted that, absent evidence of dishonesty or ill-will, an insurer has not engaged in bad faith, when it elects to "aggressively investigate [a claim] and protect its interests." The law does not require "an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit." *Condio v. Erie Insurance Exchange*, 899 A.2d 1136 (Pa.Super.2006). The plaintiff has the burden of proving bad faith by clear and convincing evidence. *O'Donnell, supra; Adamski, supra.* "The clear and convincing evidence standard is the highest standard of proof for civil claims" and "requires evidence so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts

in issue." *In re Estate of Cella*, 12 A.3d 374, 380 (Pa.Super.2010) (citations omitted).

This bad faith action is premised upon the following events. On December 24, 2006, Mr. Grossi was a passenger in a vehicle owned by Tarquinio Brothers Bakery and operated by Michael Tarquinio (collectively "Tarquinio"). Mr. Tarquinio lost control of the vehicle and struck a guardrail, and was solely and clearly liable for Mr. Grossi's damages, which flowed from a severely injured right leg. Tarquinio had an automobile liability policy on the vehicle with limits of $1,000,000, and maintained an umbrella policy with liability limits of $2,000,000. Both policies were issued by Mutual Benefit Insurance ("Mutual"). Hence, the tortfeasor, Tarquinio, had $3,000,000 in liability coverage available to satisfy Mr. Grossi's damages.

Mr. Grossi also was an insured under his parents' automobile insurance policy issued by Travelers, which contained medical benefits coverage of up to $1,000,000, and UIM coverage of $300,000. Travelers was notified about the accident two days after its occurrence. In January 2007, Mr. Grossi retained Keith R. McMillen, Esquire, to pursue litigation arising from the vehicle accident. From January 2007 to April 2008, Travelers promptly paid first-party medical benefits of roughly $500,000 and wage loss benefits of approximately $25,000 under its policy.

After payment of the aforesaid first-party benefits and, even though no UIM claim had been made, Travelers' claims adjuster, Roxanne Youndt, called Mr. McMillen on April 1, 2008, to inquire whether he wanted Travelers to leave the file open for a potential UIM claim. Mr. McMillen advised Ms. Youndt that he would be filing such a claim, and, on April 21, 2008, he sent a demand package to Travelers for the full amount of UIM cov-

erage. That package was identical to the one that Mr. McMillen had forwarded to Tarquinio's insurer, Mutual, six days earlier, on March 26, 2008.

In the demand package, Mr. Grossi's wage loss was valued at $4,252,725. That figure was based upon an assumption, as outlined in an expert report prepared by Dr. William Houston Reed, that Mr. Grossi's injuries would prevent him from assuming management of an automotive repair business owned by Mr. Grossi's father. Dr. Reed also opined that, if Mr. Grossi were to pursue a job outside of the family business, his lost future wages would be between $1.25 million and $1.736 million. In his demand correspondence, Mr. McMillen acknowledged that "the future consequences of present injuries always involve some degree of uncertainty." Trial Court Opinion, 1/23/12, at § 9. Mr. McMillen also stated in that document that he was litigating the lawsuit against the tortfeasor simultaneously with the UIM claim.

During litigation of the Tarquinio action, Travelers' counsel requested from Mr. McMillen all of the discovery obtained in the tortfeasor case. Mr. McMillen, on two occasions, supplied discovery taken in the Tarquinio litigation, but withheld other discovery in his possession, including a vocational expert report obtained by Mutual. On March 6, 2009, Mr. Grossi resolved the underlying third-party claim against Tarquinio for $950,000, less than one-third of the available coverage of $3,000,000.

After the Tarquinio action settled on March 6, 2009, Travelers obtained an independent medical examination ("IME") of Mr. Grossi on May 7, 2009, and a vocational report on June 23, 2009. The matter proceeded to UIM arbitration, where Mr. Grossi was awarded $4,000,000. Travelers promptly paid the $300,000 in UIM coverage.

Mr. Grossi thereafter initiated this bad faith action on September 29, 2009. A nonjury trial was held on October 19–20, 2011. The trial court found in favor of Mr. Grossi; it awarded him interest on the UIM claim of $25,500; attorneys' fees for the UIM claim of $26,875; attorneys' fees on the bad faith claim of $120,687.50; costs of $55,028.44; and punitive damages of $1,252,325.

In making its finding of bad faith, the trial court rendered the following legal conclusions. First, it decided that Travelers did not satisfy its duty to investigate the UIM claim because it did not obtain IME and vocational reports until over one year after the submission of the UIM claim on April 21, 2008. Second, it ruled that there was no basis for Travelers' rejection of Mr. Grossi's position that his wage loss exceeded $4,000,000. Third, it held that Travelers never offered an explanation as to why it did not offer to settle the UIM claim.

The first legal conclusion rendered by the court was that Travelers exercised bad faith because it did not obtain an IME and vocational expert report for over one year after submission of the UIM claim. However, in its factual findings, the trial court expressly acknowledged that this delay was due to the fact that Travelers was monitoring the progress of the action against the tortfeasor. Specifically, the court found, "Travelers was monitoring [Mr.] Grossi's third party claim ... and relied upon the pendency of the third party claim and $3M coverage available in the third party claim to support its failure to retain any experts to evaluate the [UIM] claim for over a year after the settlement demand was submitted." Trial Court Opinion, 1/23/12, at § 31.

Travelers' proof in this respect was as follows. On June 2, 2008, six weeks after the demand letter from Mr. Grossi, Travel-

ers' insurance adjustor, Andrew W. Makar of the major claims unit, retained counsel, Dan Moskal, Esquire, to handle the UIM claim and to obtain an orthopedic IME and vocational assessment. Mr. Moskal was aware that Mr. Grossi's litigation against the tortfeasor was pending and wanted to secure the discovery conducted in that matter. Mr. McMillen, after initiating arbitration by letter dated May 30, 2008, did not submit any writing, correspondence, or materials to Travelers after that point. Mr. Makar continually checked in with Mr. Moskal on his progress in obtaining the IME and vocational report. Mr. Moskal was attempting to obtain a copy of the IME and vocational report ordered by Mutual.

On October 3, 2008, Mr. Moskal sent a letter to Mr. McMillen scheduling Mr. Grossi's examination under oath for December 10, 2008, and asked for copies of discovery and deposition transcripts from the Tarquinio litigation. Mr. McMillen conceded that Mr. Moskal asked for "all the discovery materials" from the Tarquinio litigation. N.T. Trial, 10/19/11, at 215, 227. On November 18, 2008, Mr. Moskal sent a second letter to Mr. McMillen again asking for all discovery and depositions from the tortfeasor action. On November 20, 2008, Mr. McMillen provided written discovery responses from the underlying matter and stated that there had been no depositions. Mr. McMillen did not supply a copy of the vocational expert report authored by Celia Evans for Tarquinio, even though Mr. McMillen possessed that report. *Id.* at 222. Mr. McMillen never told Mr. Moskal that he would not forward it.

On December 10, 2008, Mr. Moskal took Mr. Grossi's examination under oath; Mr. Grossi stated that he was currently working in the family business. As of December 19, 2008, Mutual's IME had yet to be conducted. On January 16, 2009, Mr. McMillen supplied evidence of the extent of Mr. Grossi's limitations. Specifically, Mr. McMillen gave Mr. Moskal a DVD showing the auto repair shop owned by Mr. Grossi's father, and Mr. Grossi's pre-accident and post-accident activities. On April 9, 2009, Mr. McMillen provided additional discovery consisting of the deposition of Mr. Grossi's father that was conducted in the action against Tarquinio. It is not apparent when Mutual's IME was conducted, but the record substantiates that the case settled before the IME report was prepared.

The Tarquinio action settled on March 6, 2009. After realizing that a report would not be prepared, Travelers scheduled an IME with Jeffrey Kann, M.D., an orthopedic doctor, on May 7, 2009. Following that examination, Dr. Kann issued a report that day, and a supplemental report on June 1, 2009. On May 28, 2009, Mark Heckman conducted a vocational assessment and issued a report on June 23, 2009.

Herein, the trial court, in its findings of fact, specifically outlined why Travelers did not immediately secure the IME and vocational reports. It then concluded that Travelers exercised bad faith when it delayed in obtaining those items. Meanwhile, Travelers did not obtain the IME and vocational report for one year because it was monitoring the tortfeasor litigation and requested all discovery, including the IME and vocational reports obtained by Mutual.

In my view, Travelers cannot be held to have acted in bad faith in attempting to obtain Mutual's documents. Mr. McMillen admitted at trial that Mr. Moskal asked him for all of the discovery materials obtained in the Tarquinio case; thus, Mr. McMillen was aware that this request included the vocational expert report and the IME. In response, Mr. McMillen never objected. To the contrary, Mr. McMillen actively encouraged Travelers' belief that he would supply Mutual's IME and voca-

tional reports. Specifically, Mr. McMillen, on two occasions, forwarded discovery materials from the Tarquinio action to Mr. Moskal and discussed the vocational report with Mr. Moskal on December 19, 2008. N.T. Trial, 10/19/11, at 234. Mr. McMillen elected not to send Mr. Moskal the vocational report after it was in his own possession. *Id.* at 222.

It may have been poor judgment for Travelers to believe that Mr. McMillen would supply **all** of the discovery documents that it requested from the Tarquinio action, but that reliance upon Mr. McMillen does not demonstrate ill will or self-interest. The trial court's indication that Travelers "failed to obtain" the IME and vocational reports for fourteen months connotes that there were no efforts being made. However, Mr. McMillen, in his testimony, admitted that Travelers was not ignoring the UIM case; it was making efforts to obtain all the discovery from the Tarquinio case, including Mutual's IME and vocational report, which Mr. McMillen ultimately did not forward.

Once the Tarquinio case settled, Travelers obtained an IME within two months and a vocational report one month thereafter. Travelers' delay in obtaining an IME and vocational report was explained by that insurer and, in my view, negates any finding that, by clear and convincing evidence, it engaged in self-interest or ill will in that respect.

Second, the trial court rendered the legal conclusion that there was no basis for Travelers' rejection of Mr. Grossi's position that his wage loss would exceed $4,000,000. The trial court's factual findings directly undermine and conflict with this legal conclusion. The following facts are pertinent in this respect. After receiving the UIM demand, Ms. Youndt completed a UIM worksheet. She placed the $4,252,725 wage loss figure in that document. The trial court expressly noted that, in the worksheet, "Ms. Youndt **did not conduct any independent evaluation** of the value of Plaintiff's alleged future lost income; rather, Ms. Youndt's completion of the Worksheet **was merely a summary by which to Advise the Major Claim Unit** (MCU) of the Plaintiff's UIM claim so that it could evaluate whether the UIM Claim should be reassigned to the MCU (Major Claims Unit)." Trial Court Opinion, 1/23/12, at § 13 (emphases added).

This factual finding is supported by Ms. Youndt's affidavit, wherein she stated that she did not prepare the worksheet in order to evaluate the damages suffered by Mr. Grossi. Instead, she used the worksheet as a mechanism to transfer the claim to the major claims unit of Travelers and a more sophisticated adjustor. She placed the $4,252,725 wage loss figure on the worksheet as a summary of Mr. Grossi's demand rather than as an acceptance that his wage loss would amount to that figure.

I am aware that Travelers' manual provides that the UIM worksheet is to be an evaluation of an UIM claim. However, Ms. Youndt, due to the complex and significant nature of the claim herein, did not follow the manual. Instead, she used the worksheet to summarize the claim so that it could be transferred to a more sophisticated unit and experienced adjuster. Furthermore, as outlined *infra*, that adjustor performed the required analysis of the claim on May 23, 2008, within two months of its receipt. In light of these circumstances, the fact that the UIM worksheet was not an analysis cannot constitute bad faith. *Zappile v. Amex Assurance Co.*, 928 A.2d 251, 258 (Pa.Super.2007) (insurer's failure to follow manual on single occasion was not bad faith where error was not "part of an ongoing pattern or was anything other than a single mistake").

The trial court made another set of factual findings as follows. After Ms.

Youndt's UIM worksheet was prepared, the UIM claim was reassigned to insurance adjuster Andrew W. Makar of the major claims unit. When Mr. Makar reviewed Ms. Youndt's UIM worksheet, he did not consider the portions of the document discussing future lost wages as constituting an evaluation of those potential damages. Instead, Mr. Makar viewed the UIM worksheet as merely a summary of the UIM claim due to "the wording [Ms. Youndt] used in [the UIM] worksheet" and that "Ms. Youndt identified critical issues to be addressed that included determining the value of the case, the severity and permanency of the injuries, and whether Plaintiff would regain pre-accident mobility." Trial Court Opinion, 1/23/12, at § 18.

The trial court continued as follows. After his evaluation, Mr. Makar concluded that the crucial issue pertaining to valuation of the UIM claim was whether Mr. Grossi, despite his injured leg, could return to work and assume management of his father's automotive repair business. Mr. Makar knew that, in May 2008, Mr. Grossi began to work in his family business. In a May 22, 2008 letter, thirty days after receipt of the claim, Mr. Makar responded to Mr. McMillen and indicated that he evaluated Mr. Grossi's future wage loss claim as highly speculative and an open issue. Particularly, Mr. Makar was aware that vehicles are repaired on lifts and that Mr. Grossi, who could not crouch or bend due to his injured right leg, could possibly assume management of his father's business despite his injuries.

On June 26, 2008, Mr. Makar issued a written report called a claims file analysis, which has the same purpose as a UIM worksheet. *See* N.T. Nonjury Trial, 10/20/11, at 486 (when asked the purpose for a claims file analysis, Mr. Makar responded that it was the same as that of a worksheet). Mr. Makar concluded that Travelers' UIM coverage would not be triggered. This determination was grounded on these facts: 1) by May of 2008, Mr. Grossi was employed at his father's automotive business; 2) Mr. Grossi still had rehabilitation possibilities; 3) Mr. Makar believed that, despite the limitations arising from his injured leg, Mr. Grossi would be able to assume control of the family business; 4) Mr. Makar believed that accommodations could be made; 5) the tortfeasor had clear liability; and 6) the tortfeasor possessed $3,000,000 in insurance coverage.

Due to the outstanding critical question about the extent of wage loss, Mr. Makar did not assign a wage loss amount to the UIM claim. Although he believed that the value of the UIM claim would not exceed the tortfeasor's liability limits of $3,000,000, Mr. Makar placed a $1,000 reserve on it due to state law requirements that an insurer place a reserve figure on a claim.

Mr. Makar's assessment of Mr. Grossi's actual damages was confirmed when Mr. Grossi settled the underlying third-party claim against Tarquinio on March 6, 2009, for $950,000, which was less than one-third of the tortfeasor's available coverage. Mr. Makar's opinion was also bolstered by the IME and vocational report obtained by Travelers. The IME, which Mr. Makar read, confirmed Mr. Makar's belief that Mr. Grossi could still manage his family business despite his injuries. Mr. Makar obtained an oral report[1] from the voca-

---

1. The trial court found that "Makar did not offer any explanation as to why he did not review the Heckman report or possess a copy of the report." Trial Court Opinion, 1/23/12, at § 38. This statement is a misrepresentation of the record. Mr. Makar did offer an explanation; he twice stated that he was verbally told about its contents. Then, the trial court states, in the same paragraph, that Mr. Makar was unable "to attribute a credible reason" as to why Mr. Heckman's written

tional expert, Mr. Heckman, and the oral report also supported Mr. Makar's belief that Mr. Grossi would sustain minimal wage loss due to his injuries.

All of the above facts undermine the trial court's second legal conclusion, *i.e.,* there was no basis for Travelers' rejection of Mr. Grossi's position that his wage loss would exceed $4,000,000. Indeed, the trial court paradoxically accepted the opinion of Mr. Grossi's expert, Harry Paras, Esquire, who opined that Travelers had no basis for rejecting the claim that Mr. Grossi would suffer $4,252,725 in wage loss, solely on the ground that Ms. Youndt's worksheet was an evaluation that the loss suffered by Mr. Grossi exceeded the available limits of Mutual's policy. Meanwhile, the trial court had made the specific factual finding on two or three occasions in its decision that the worksheet was **not** an evaluation. It likewise, on several occasions, accepted that the worksheet was merely a summary of the UIM claim submitted by Mr. Grossi.

In addition, the worksheet on its face did not constitute an acceptance of the $4,252,725 wage loss figure. That document internally challenged the position that Mr. Grossi would not be able to manage the car repair business. Specifically, in the "resolution" section of the UIM worksheet, Ms. Youndt identified critical issues to be addressed. Those issues included determining "Whether value of injuries exceed the underlying limits. Severity and permanency of injuries. Whether claimant regains pre-accident mobility." Uninsured Motorist Worksheet, 5/16/08, Defendant's Exhibit G at 7. Thus, the worksheet itself outlined outstanding unresolved questions that had to be answered before it could be determined that Mr. Grossi would not be able to manage his family business.

In light of what the document itself states, I believe we are compelled to reject the trial court's reliance on Mr. Paras' opinion that Ms. Youndt's worksheet constituted an admission that Mr. Grossi's damages would exceed $3,000,000 and trigger full UIM coverage. In this respect, our decision in *Zappile, supra,* is controlling. Therein, the bad-faith expert witness relied upon "a letter that did not state what the expert claimed and the trial court found it stated." *Id.* at 259. We held that since the document in question was incorrectly characterized by the expert witness, the trial court's reliance on the expert's opinion had to be rejected. *Id.; see also Collins v. Hand,* 431 Pa. 378, 246 A.2d 398, 404 (1968) ("An expert cannot base his opinion upon facts which are not warranted by the record."); *accord City of Philadelphia v. W.C.A.B. (Kriebel),* 612 Pa. 6, 29 A.3d 762, 770 (2011) ("while an expert may base his opinion on facts of which he has no personal knowledge, those facts must be supported by evidence of record"). Likewise, in this case, the trial court's acceptance of the opinion of the expert witness must be dismissed since the worksheet did not constitute an admission that Mr. Grossi's wage loss would be in excess of $4,000,000.

In my view, this evidence plainly demonstrates that Travelers did not willfully and without basis reject the $4,252,725 wage loss estimate. Travelers acted in conformity with its right to protect its interest, investigate a claim, and not blindly accept the highest possible wage loss estimate proffered by an insured. Mr. Makar conducted an evaluation in the form of a claims file analysis and proffered sound reasons for rejecting Mr. Grossi's projected wage loss. His evaluation was con-

---

report was not in his file. *Id.* The reliability of the reason offered is, of course, a different matter. In my opinion, an oral summary of a vocational report to an adjustor by his counsel cannot serve as a basis for a finding of bad faith.

firmed by the tortfeasor settlement and the IME and vocational reports obtained by Travelers. Furthermore, I find it contrary to common sense to impute bad faith to Travelers for appraising the UIM claim at less than three million dollars when Mr. Grossi himself compromised his claim for $950,000 in the face of coverages that existed far in excess of that settlement. Travelers did not engage in ill will or self-interest; indeed, it is a strain to characterize its actions as negligent. Thus, the second legal conclusion outlined by the trial court is unsupported by clear and convincing evidence.

The final legal conclusion outlined by the trial court to support its verdict was that Travelers did not offer a basis for failing to offer to settle the UIM claim prior to arbitration. This position is completely unsupported. Mr. Makar stated that no settlement was offered due to the results of Travelers' IME and vocational assessment. On June 1, 2009, Dr. Kann issued a supplemental IME report indicating that, with the accommodation of a vehicle lift, Mr. Grossi could perform nearly all of the tasks necessary to run the family business. The record substantiates that Mr. Makar reviewed Dr. Kann's IME. N.T. Non–Jury Trial, 10/20/11, at 491 ("Mr. Makar, did you receive the IME report of Dr. Kann from Mr. Moskal? THE WITNESS: Yes, I did. THE COURT: And was that in your file? THE WITNESS: Yes, Sir."); *id.* at 521 (Mr. Makar testified that, following his review of Dr. Kann's report, he concluded that there was no UIM liability).

On May 28, 2009, Mr. Heckman conducted a vocational assessment and issued a June 23, 2009 report indicating that Mr. Grossi, based upon his physical limitations, would sustain minimal earnings loss if he assumed control of the family business, where he was, at that point, actually working. Mr. Makar was apprised of the contents of that report orally. *Id.* at 491 (Mr.

Makar admitted that a copy of Mr. Heckman's report was not in his file, but he testified that he "got an oral" description of it); *id.* at 579 (when asked on cross-examination whether he went to arbitration "without ... ever receiving a report from Heckman," Mr. Makar responded, "Not written report. I did receive an oral."). The refusal to settle was based upon the above-delineated rationale.

The case law unequivocally supports the conclusion that Travelers did not engage in bad faith. In *Johnson v. Progressive Ins. Co.,* 987 A.2d 781 (Pa.Super.2009), we affirmed the trial court's entry of summary judgment in favor of an insurer in a bad faith lawsuit instituted by its insured. Therein, the insured made an underinsured motorist claim. The insurance company sought documentation regarding whether the insured's injuries from the accident at issue were causally related to that event or whether they were pre-existing problems that were the result of five previous traffic accidents in which the insured was involved. Rather than respond, the insured proceeded with arbitration where he received an award of $75,000. The insurer obtained an IME and offered $30,000 prior to arbitration; however, the insured instituted the bad faith litigation, arguing that the insurance company acted with ill will or self-interest in not offering more than it did before the arbitration.

In upholding the grant of summary judgment, we observed that the insurance company investigated the UIM claim and obtained an IME. We opined that the company properly obtained that examination since there were indications that the insured's condition was improving. We further observed that the insurance company never disregarded uncontroverted evidence of loss, but, instead, reasonably estimated the damages that could be recovered by its insured. We noted that an

insurer does not evidence bad faith when it makes a low but reasonable estimate of an insured's damages.

Similarly, in the present matter, Travelers continually acted with respect to the UIM claim. The claim was transferred to its major claims unit, where an analysis was conducted. The major claims adjustor immediately hired an attorney, who was tasked with obtaining an IME and vocational report. The insurer conducted surveillance to confirm the extent of Mr. Grossi's loss of mobility. The IME and vocational report, as outlined above, were not immediately obtained because Travelers anticipated receipt of those items from Mutual. That expectation was reasonable in light of Mr. McMillen's failure to object to Travelers' pursuit of Mutual's IME and vocational reports and his dissemination of other discovery materials obtained in the tortfeasor's action. Travelers' evaluation that Mr. Grossi, despite his injured leg, would be able to assume control of his family business was cogently supported. Clearly, Travelers' assessment of damages was a proper exercise of its rights and did not constitute ill will or self-interest in proceeding to arbitration.

In *Condio v. Erie Ins. Exchange*, 899 A.2d 1136 (Pa.Super.2006), we reversed an award against Erie in a bad faith case and entered judgment n.o.v. in its favor. The bad faith litigation was brought against that insurer based on its handling of a UIM matter. Therein, a single car accident occurred with two people inside the vehicle. Erie was liable for UIM coverage only if its insured was not driving the car when the accident occurred. We held that Erie investigated the UIM claim and had a reasonable basis for rejecting it due to valid factual issues concerning whether its insured or the other person involved in the car was driving.

I find the present case analogous to *Brown v. Progressive Insurance Co.*, 860 A.2d 493 (Pa.Super.2004). Therein, we reversed a trial court's determination that an insurer acted in bad faith in litigating a UIM claim and entered judgment n.o.v. in its favor. The insured was injured in a traffic accident, and, as in this case, it was uncontested that the tortfeasor in the underlying litigation was solely responsible for the accident. The UIM insurer estimated that the insured's damages were less than the amount of coverage provided under the driver's policy, and it did not settle until the eve of arbitration.

As in this case, the UIM carrier in *Brown* had a good faith basis to dispute the amount of the insured's wage loss in that he was employed by a family business, which continued to pay him after the accident. The insured had insisted that the amounts distributed to him were advancements on his inheritance. We concluded that the facts failed to reveal clear and convincing evidence of bad faith because the record did not support the trial court's finding that the insurer did not properly evaluate the insured's claim. In so doing, we observed that the carrier was not responsible for UIM coverage unless the insured's damages were more than the amount of the tortfeasor's policy coverage and that the insurer had reasonably estimated that the damages would not exceed the policy limits of the other driver. We held that these types of actions, while advancing the insurer's self-interest, was not the type of self-interest that constituted bad faith.

Travelers' actions are virtually indistinguishable from those examined in *Brown.* They certainly bear no resemblance to an unfounded refusal to pay a legitimate claim for benefits that supported both the bad faith finding and punitive damages award in *Hollock v. Erie Insurance Exchange,* 842 A.2d 409 (Pa.Super.2004) (*en banc*), upon which the majority relies. Therein,

the insurer affirmatively misrepresented the amount of coverage at issue and was dilatory. Additionally, without any basis, it contested evidence submitted by its insured on the coverage issues involved in the matter. Herein, Travelers diligently evaluated the extent of Mr. Grossi's damages and, based upon valid factors, concluded that they did not exceed $3,000,000.

Under the facts at issue, I believe that Travelers is entitled to judgment n.o.v. The evidence wholly fails to establish, by clear and convincing proof, the existence of ill will or self-interest on the part of Travelers. Indeed, in my view, there is scant proof of bad judgment.

Additionally, even if a finding of bad faith could be upheld, the punitive damages award herein is unwarranted. Section 8371 provides that, "if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions ... [a]ward punitive damages against the insurer." 42 Pa. C.S. § 8371(2). In *Hollock, supra* at 419–20, we noted that "the elements of proof necessary to establish a claim for punitive damages under this section are co-extensive with those that establish the bad faith claim itself." We upheld a sizable punitive damage award of $2.8 million therein. We observed that Pennsylvania law requires that the "size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Id.* at 420 (citation omitted). Under this standard, we analyze these factors: "(1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant." *Id.* (citation omitted).

In *Hollock*, we upheld the punitive damages award due to the insured's calculated indifference to its insured, the lack of any basis for rejecting its insured's claim, and

its blatant dishonesty. No such misconduct occurred herein. Travelers made no misrepresentations, had a valid basis for questioning the measure of damages submitted by Mr. Grossi, and proceeded to handle the claim with reasonable diligence under the circumstances.

Hence, I dissent.