J-A19021-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| WILLIAM F. RHODES, JR. AND CARRIE E. RHODES | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| USAA CASUALTY INSURANCE COMPANY | |
| Appellee | No. 1431 WDA 2013 |

Appeal from the Judgment Entered August 20, 2013
In the Court of Common Pleas of Blair County
Civil Division at No(s): 2004 BN 2279

BEFORE:  BENDER, P.J.E., OLSON and FITZGERALD,* JJ.

MEMORANDUM BY OLSON, J.:                **FILED DECEMBER 16, 2014**

Appellants, William F. Rhodes, Jr. and Carrie E. Rhodes (hereinafter, collectively "the Rhodeses"), appeal from the judgment entered on August 20, 2013.  We affirm.

In an earlier opinion from this Court, we summarized the pre-trial posture of this case.  As we explained:

> On July 1, 2000, while Mr. Rhodes was driving his brother's motorcycle, he was involved in an accident, from which he suffered numerous injuries sufficiently serious as to require hospitalization in an intensive care unit for several days. [At the time, the Rhodeses were the named insureds on a USAA Casualty Insurance Company (hereinafter "USAA") motor vehicle policy, which provided underinsured motorist (hereinafter "UIM") coverage in the total amount of $200,000.00]. . . .

> The Rhodeses filed a claim with State Farm Insurance Company, which was the insurer of the tortfeasor, *i.e.*, the driver of the vehicle that collided with [Mr. Rhodes].  State

* Former Justice specially assigned to the Superior Court.

Farm paid $50,000[.00], which was the liability limit of the tortfeasor's policy, to the Rhodeses. Subsequently, on August 20 2001, the Rhodeses contacted USAA [(their insurer)] and Progressive Insurance Company [(the insurer of the motorcycle)], with notice of an underinsured motorist claim. Progressive tendered payment of $15,000[.00] to the Rhodeses on October 12, 2001.

On May 10, 2002, the Rhodeses [provided] to USAA their statement of demand settlement package, which included medical records and other documentation as to [Mr. Rhodes'] injuries and damages. The Rhodeses placed a total value on their claim of $235,000[.00], and offered to settle for $175,000[.00]. On July 10, 2002, Linda Barboza, the USAA claims examiner for large loss claims assigned to the Rhodeses' claim, offered to settle for $5,000[.00]. USAA contended that there was a question as to causation for one of [Mr. Rhodes'] injuries, specifically a neck injury. The Rhodeses rejected the offer as "ridiculous" and "not made in good faith" and requested arbitration.

At this point, Alma Trevino, a USAA senior litigation manager for the northwest region, and Joel Kormanski, outside counsel [(hereinafter "Attorney Kormanski")], took over the Rhodeses' claim. After reviewing the Rhodeses' file[,] and in light of the $65,000[.00] already paid by other insurance carriers on the claim, Ms. Trevino determined that Ms. Barboza's $5,000[.00] settlement offer was fair. However, when [Attorney] Kormanski initially reviewed the case, he determined that the Rhodeses' claim was worth more than $5,000[.00], but less than the Rhodeses' $200,000[.00] policy limit. [Attorney] Kormanski informed Ms. Trevino of his determination via letter dated August 6, 2002. Slightly more than a month later, on September 15, 2002, [Attorney] Kormanski informed Ms. Trevino that it would probably require $50,000[.00] to $65,000[.00], or more, to resolve the Rhodeses' case. [Attorney] Kormanski sought an independent medical examination of Mr. Rhodes, particularly with regard to the disputed neck injury. . . .

Dr. Kelly Agnew, an orthopedic physician, conducted the [independent medical] examination on November 14, 2002, immediately following which Dr. Agnew wrote a report favorable to USAA's position as to causation of [Mr.

- 2 -

Rhodes'] neck injury. Mr. Rhodes underwent a surgical procedure related to his neck injury in January 2003.

By letter dated July 1, 2003, USAA increased its settlement offer to $50,000[.00], which the Rhodeses rejected. USAA then made several other offers, of $65,000[.00]; of $80,000[.00]; and[,] on November 21, 2003, a "bottom line" offer of $100,000[.00], all of which were rejected. On December 4, 2003, the Rhodeses renewed their settlement demand of $175,000[.00], and stated that if the offer were not accepted by December 29, 2003, it would be withdrawn and the parties would proceed to arbitration. USAA agreed to settle the claim for $175,000[.00] on December 22, 2003. After rejecting two drafts of a settlement/release agreement, the Rhodeses accepted and signed the final agreement on January 12, 2004.

On July 15, 2004, the Rhodeses filed suit against USAA for breach of its contractual duty to act in good faith in the handling of their underinsured motorist claims and sought compensatory and punitive damages in accordance with 42 Pa.C.S.A. § 8371 and Pennsylvania common law. After nearly two years of discovery, on July 13, 2006, the Rhodeses filed a motion for partial summary judgment; and on August 17, 2006, USAA filed its own motion for summary judgment. Oral argument on the cross motions [for summary judgment] was held on September 15, 2006. . . .

[O]n October 11, 2006 [(which was before the trial court rendered a decision on the cross-motions for summary judgment),] the trial court granted in part USAA's Motion to Compel Plaintiff's Response to Defendant's First Set of Interrogatories and Request for Production of Documents. In its [October 11, 2006] order, the trial court directed that the Rhodeses provide USAA with the entire content of their attorney's file on the underlying [UIM] claim, excluding any information protected by the attorney-client privilege. The trial court reasoned that [the Rhodeses' attorney's] file was discoverable because [the issue of] whether the Rhodeses acted in good faith in the underlying UIM claim was relevant to whether USAA's conduct constituted bad faith. USAA claimed that it needed the information to evaluate whether its insureds . . . acted in good faith, and the trial court agreed with this rationale. . . .

- 3 -

On November 8, 2006, the trial court granted reconsideration and vacated its October 11, 2006 order pending review. However, before argument could take place on the Rhodeses' reconsideration motion, [the trial court issued its order on the cross-motions for summary judgment. Specifically,] . . . the trial court denied the Rhodeses' motion for partial summary judgment, but granted USAA's motion for summary judgment and dismissed the Rhodeses' complaint with prejudice. The Rhodeses filed a timely appeal [from the trial court's summary judgment order], and USAA cross-appealed.

On [January 31, 2008], th[e Superior Court vacated the trial court's summary judgment order in part and remanded the case for further proceedings. Specifically, we vacated the portion of the order that granted USAA's motion for summary judgment because, we concluded, there were genuine issues of material fact that needed to be resolved at trial. Within our January 31, 2008 memorandum, we also affirmed the portion of the trial court's order that denied the Rhodeses' cross-motion for summary judgment and we quashed USAA's cross-appeal from the summary judgment order. *Rhodes v. USAA Cas. Ins. Co.*, 951 A.2d 1225 (Pa. Super. 2008) (unpublished memorandum) at 1-30 (hereinafter "*Rhodes I*")].

. . .

On remand, [a new trial court judge] was assigned to preside over the matter. On August 31, 2009, [the trial court] reinstated the October 11, 2006 order granting USAA's motion to compel [the production of documents].

*Rhodes v. USAA Cas. Ins. Co.*, 21 A.3d 1253, 1255-1257 (Pa. Super. 2011) (hereinafter "*Rhodes II*") (internal citations, footnotes, and corrections omitted) (some internal quotations omitted).

The Rhodeses filed a timely notice of appeal from the trial court's collateral order granting USAA's motion to compel the production of

documents. On appeal, the Rhodeses claimed that the trial court "abused its discretion by ordering [them] to produce their attorney's entire work product, without identifying, performing a relevancy analysis, or examining any of counsel's protected records under Pa.R.C.P. 4003.3." ***Rhodes II***, 21 A.3d at 1258. On May 17, 2011, this Court filed a published opinion, wherein we concluded that the trial court had erred when it granted USAA's motion to compel the production of documents. Therefore, we vacated the trial court's discovery order and remanded the case for trial. ***Rhodes II***, 21 A.3d at 1258.

The case proceeded to a five-day bench trial. The trial court explained the evidence that was presented during the trial, as well as the factual findings it rendered from this evidence:

> Through their attorney, [Richard Serbin, Esquire (hereinafter "Attorney Serbin")], the Rhodeses notified USAA of their [UIM] claim on August 20, 2001. Linda Barboza, a claims handler employed by USAA, was assigned the case on September 7, 2001. By letter dated October 5, 2001, Attorney Serbin wrote to Ms. Barboza advising her it was "premature to make a claim" since Mr. Rhodes continued receiving medical treatment.
>
> . . .
>
> [On May 17, 2002, Attorney Serbin] submitted to USAA [the Rhodeses'] statement of demand (dated May 10, 2002), wherein they informed [USAA that] they [valued] their claim at $235,000.00, which [was] in excess of USAA's UIM stacked coverage of $200,000.00, and [that they] offered to settle their claim for $175,000.00. By this time, the Rhodeses had received $50,000.00 from State Farm and $15,000.00 from Progressive Insurance Company.

. . .

On June 20, 2002, USAA ran a Colossus[1] report using the statement of demand and Mr. Rhodes' medical records[. The Colossus program initially] produced a value on the claim of $9,949.00 to $22,609.00. . . . [At the time of the initial input, Ms. Barboza] entered into the computer system [] the statement of demand's representation that Mr. Rhodes had suffered a disc herniation in his neck as a result of the accident. . . .

[Following the initial Colossus report, a] member of USAA's Colossus team, Kathy Ortiz, informed Ms. Barboza that disc herniation should not have been entered into the computer system because Mr. Rhodes did not treat for [the] neck injury until more than one year [after] the accident. [Therefore, at Ms. Ortiz's] direction, Ms. Barboza substituted ["neck soft tissue injury"] for ["disc herniation"]. The second Colossus run resulted in a value of $0 to $3,209.00 (money in excess of the $65,000.00 the Rhodeses had already received). The second [Colossus] run included $7,500.00 (up from $5,000.00) for disfigurement. . . .

[On July 10, 2002, USAA offered to settle the claim for $5,000.00. This initial offer was] based on a total value of the claim at $70,000.00. On July 15, 2002, [the Rhodeses, through Attorney Serbin, rejected the $5,000.00 offer. Further, within Attorney Serbin's rejection letter, Attorney Serbin demanded that USAA select an arbitrator and Attorney Serbin] advised USAA [that] he considered the initial offer was made in bad faith. No counter-demand was made. . . .

USAA transferred the Rhodeses' claim to [Blanca Alma Trevino] on July 29, 2002, because of the demand for arbitration, *i.e.*, litigation. Also, on July 29, 2002, USAA referred the defense of the Rhodeses' claim to the law firm

_____

[1] Blanca Alma Trevino, USAA's senior litigation manager, testified during the trial that "Colossus" is a software program that USAA utilizes to evaluate injury claims. N.T. Trial, 12/5/11 (afternoon session), at 20.

of Meyer Darragh. On August 1, 2002, Joel Kormanski, Esquire, of Meyer Darragh [(hereinafter "Attorney Kormanski")], called Ms. Trevino to discuss the assignment.

From this point on in the chronology of events leading up to USAA's paying the Rhodeses their settlement demand of $175,000.00 on January 12, 2004, there is a difference in the factual statements of the parties [and] . . . in the effect the actions or inactions of USAA had on the ultimate outcome of the Rhodeses' claim. The [trial c]ourt finds credible the evidence hereafter set forth.

Mr. Rhodes suffered a football injury in 1991, which produced symptoms similar to those he complained of at the time of his written statement under oath to USAA. [Dr. D. Kelly Agnew] conducted an independent medical examination [(hereinafter "IME")] of Mr. Rhodes on November 14, 2002. Attorney Kormanski received Dr. Agnew's report on December 3, 2002, and sent it to Attorney Serbin [and Ms. Trevino] on December 10, 2002. [Within Dr. Agnew's report, Dr. Agnew concluded the following:

> Clearly, Mr. Rhodes had a history of cervical injury in 1992. He had been injured playing football. He had several months of chiropractic care. He volunteers that he did have upper extremity paresthesias from the injury and, in fact, when he returned to football he had recurrent paresthesias. This history is confirmed in the neurologist's notes. As such, Mr. Rhodes had to leave football due to upper extremity neurologic complaints.

> Indeed, Mr. Rhodes had prior complaints of upper extremity paresthesias when he would turn his head. Dr. [Kornel] Lukacs, in August of 1993, clearly indicated that there was numbness radiating to the arm and that when Mr. Rhodes turned his head to the right there would be neck discomfort and arm numbness.

> It would certainly appear that Mr. Rhodes had enough of a cervical injury in 1993 to cause some positional nerve root irritation.

Mr. Rhodes was involved in a well[-]documented motorcycle accident [on] July 1, 2000. Abrasions and contusions were documented including abrasions to the upper extremities and the left knee. These abrasions have all healed. He has minimal skin discoloration. Overall, they have healed with goof [sic] cosmesis. These healed abrasions are not a source of any limitations or disability whatsoever.

There is nothing in the medical records to suggest that Mr. Rhodes sustained any structural damage to the left knee in the motorcycle accident. Clearly, he did have an anterior abrasion. The MRI obtained shortly after accident would rule[] out any structural damage. Indeed, his knee examinations are normal and symmetrical today. Mr. Rhodes has not sustained any impairment about the left knee from the motorcycle accident. Again, the abrasion at the knee has simply healed.

Mr. Rhodes was to later voice cervical complaints. There is no documentation in the early medical records including the records of Drs. Thompson, Schmidt, and Rowe that there were any complaints about the cervical spine in the months following the [July 1, 2000 motorcycle] accident. Physical therapy notes would appear to be aimed exclusively at the knee early on without any mention of the cervical spine.

One year later, Dr. [Frank E. Sangiorgio] documented some cervical complaints. There would be no way to ascribe cervical complaints documented one year later to the motorcycle accident.

Mr. Rhodes has been evaluated by two cervical MRI studies. I have had the opportunity to review both of those studies. The studies reveal aging changes. He has bone spur or osteophyte formation and disc bulging at two levels. There are no traumatic changes which might be ascribed to the motorcycle accident. Again, there was no documentation of symptoms in the medical records until one year after the motorcycle accident.

Mr. Rhodes has an unremarkable examination of cervical spine. However, his history of radiating discomfort with turning his head to the right could indicate that he is having some intermittent positional irritation of a nerve root, in all likelihood the C6 nerve root, since it is accompanied by thumb numbness. He has no actual radicular findings to confirm radiculopathy such as a diminished biceps reflex, biceps atrophy[,] or diminished biceps strength. The sensory disturbance which he reports to pinprick is not purely radicular.

Any positional irritation of a cervical nerve root, which Mr. Rhodes may be experiencing, is unrelated to his motorcycle accident. Again, it would appear that he had similar symptoms after a football injury in the early 1990's. These symptoms could be produced by the degenerative changes seen in his cervical spine by MRI. There is certainly nothing to suggest that these changes were in any[] way accelerated or aggravated by the motorcycle accident. Again, there is no documentation of these symptoms in the medical records for one year following that event.

D. Kelly Agnew, M.D. Report, dated 11/14/02, at 17-19].

On November 21, 2002, at a pre-arbitration conference, Attorney Serbin informed Attorney Kormanski that Mr. Rhodes had undergone tests with Dr. [Ciceron L.] Opida and had been referred for a surgical evaluation with a neurosurgeon in December, and Mr. Rhodes would not be ready for an arbitration hearing until the following spring. On December 3, 2002, Mr. Rhodes treated with Dr. [E. Richard] Protsko and was referred for an angiogram and a consult with Dr. Kyle Kim. . . . On December 20, 2002, Dr. Kim recommended cervical surgery and Mr. Rhodes intended to schedule the surgery.

The arbitration panel had set April 30, 2003[] as the date for the hearing.

On January 21, 2003, Mr. Rhodes had cervical surgery. The treatment records of Dr. Opida, a neurologist, contained no reference to Dr. Kim or that Mr. Rhodes was to undergo surgery. On January 21, 2003, Attorney Kormanski

received medical records [from] Dr. Protsko, an associate of [Dr. Kim's], which contained no indication of surgery being scheduled.

Dr. Agnew sent Attorney Kormanski a supplemental report, dated February 28, 2003, and received by Attorney Kormanski on March 17, 2003, which contained no reference to Mr. Rhodes' surgery.

As of March 13, 2003, Ms. Trevino anticipated increasing the settlement offer based on additional information from Attorney Kormanski.

On March 20, 2003, Attorney Kormanski called Attorney Serbin[] to discuss Dr. Agnew's objections to Attorney Serbin's subpoena, and learned, for the first time, [that] Mr. Rhodes had undergone neck surgery in January. Attorney Serbin placed USAA on notice at that time that the accident caused Mr. Rhodes to suffer a vascular injury to his neck. This was Attorney Kormanski['s] and USAA's first notice [that] Mr. Rhodes [had] suffered a vascular injury. On March 20, 2003, Attorney Kormanski called Ms. Trevino and advised her of what he had learned.

On March 21, 2003, Attorney Kormanski received Mr. Rhodes' [surgical] records from [Attorney Serbin. Attorney Kormanski] immediately forwarded them to Dr. Agnew for his review and opinion. Dr. Agnew authored a March 27, 2003[] report wherein he rendered an opinion that the vascular surgery was unrelated to the July 1, 2000 [motorcycle accident]. [However,] Dr. Agnew [informed] Attorney Kormanski that vascular surgery was outside [of] his specialty.

On March 31, 2003, Attorney Kormanski learned that the arbitration hearing was continued.

On April 16, 2003, Attorney Kormanski wrote [to] Attorney Serbin[, informing] him [that] he was waiting for a medical report from him that would support the Rhodeses' contention that the neck complaints were related to the accident.

Following the surgery with Dr. Kim, Mr. Rhodes received an evaluation from Dr. Lukacs, who had treated Mr. Rhodes in 1992 for his 1991 football injury, but not since then. On May 5, 2003, Dr. Lukacs wrote a letter to Attorney Serbin stating [that] the need for the [January 21, 2003] neck surgery was caused by the July 1, 2000[] accident. The first report of causation [Attorney Kormanski] received from Attorney Serbin was in a June 5, 2003 letter, which included Dr. Lukacs'[] report and office records. Dr. Lukacs is a neurologist.

Dr. [Michael G.] Moncman conducted an independent medical records review of Mr. Rhodes' medical records. On July 14, 2003, Attorney Kormanski received Dr. Moncman's report. Dr. Moncman provided a second report, dated July 21, 2003. Dr. Moncman opined [that] there was no way a conclusion could be reached with reasonable medical certainty that the motorcycle accident caused Mr. Rhodes to have vertebrobasilar symptoms one year later. In Dr. Moncman's supplemental report, received by Attorney Kormanski on July 24, 2003, he advised with reasonable medical certainty [that] Mr. Rhodes' vertebrobasilar insufficiency was not caused by the accident.

On October 7, 2003, Dr. Sangiorgio authored a report. In his report, Dr. Sangiorgio opined that Mr. Rhodes' problems were directly a result of the accident on July 1, 2000. Attorney Serbin sent Dr. Sangiorgio's report to Attorney Kormanski and a letter dated October 13, 2003, and made a demand of $160,000.00. Attorney Kormanski had not received previous reports from Dr. Sangiorgio.

On December 2, 2003, Attorney Serbin sent to Attorney Kormanski Dr. Kim's November 14, 2003 report. In [that] report, [Dr. Kim] stated Mr. Rhodes' prognosis was excellent and it would be reasonable to conclude [that] the accident caused his symptoms or aggravated a pre-existing condition. Attorney Kormanski sent copies of Dr. Kim's report to USAA, Dr. Agnew[,] and Dr. Moncman.

In a letter dated December 4, 2003, Attorney Serbin increased the Rhodeses' demand to $175,000.00. In a letter dated December 22, 2003, Attorney Kormanski

advised Attorney Serbin that USAA agreed to pay $175,000.00.

By the time of the settlement of the Rhodeses' claim, USAA had in its possession two reports from Dr. Moncman and three reports from Dr. Agnew that the July 1, 2000 motorcycle accident did not cause Mr. Rhodes to suffer any type of neck injury nor was there a need for neck surgery.

Attorney Kormanski, soon after he was retained, informed USAA he did not necessarily believe the value of the Rhodeses' UIM claim was more than $5,000.00, on top of the $65,000.00 [the Rhodeses] already had received. However, there are uncertainties with litigation and expenses and he could see a willingness to move to a higher amount to settle the claim.

Alma Trevino did not increase Linda Barboza's offer of $5,000.00 because she believed she would not be able to offer enough money to satisfy the Rhodeses, and she had no report causally linking [Mr. Rhodes'] disc herniation, which was included in the settlement demand, to the accident.

Trial Court Opinion, 7/19/13, at 3-9 (internal citations omitted) (some internal capitalization omitted).

On July 19, 2013, the trial court entered its verdict in the case, finding in favor of USAA and against the Rhodeses. As the trial court explained in its contemporaneously filed opinion, it found in favor of USAA because the Rhodeses did not prove, by clear and convincing evidence, that there was an "unreasonable delay in the resolution of the Rhodeses' claim caused by USAA's not having a reasonable basis for paying the Rhodeses' settlement demand sooner." *Id.* at 13.

On July 25, 2013, the Rhodeses filed a 29-page post-trial motion, which the trial court denied on August 9, 2013. Judgment was entered on

August 20, 2013 and the Rhodeses filed a timely notice of appeal. The Rhodeses raise five claims on appeal:

1. Whether the [trial c]ourt misapprehended the issues raised by the insureds, and as a result of its narrow and inaccurate definition of the issue, overlooked clear and convincing evidence of the insurer's continuing course of bad faith conduct?

2. Whether the [trial c]ourt followed the law of the case established in the two prior opinions of [the Superior] Court regarding the focus of a bad faith claim, the scope of the insurer's conduct to be reviewed, and the evidence to be considered?

3. Whether the [trial c]ourt erred in quashing the insureds' timely served Rule 234.3 Notices to Attend and Produce [D]ocuments, directed to the insurer's management employees involved with the claim, and thereafter abused its discretion by refusing to apply the missing witness rule when the identified employees did not attend?

4. Whether the [trial c]ourt abused its discretion by precluding the admission of the trial deposition of the insurer's deceased senior supervisor and litigation claims advisor to the responsible claims handlers?

5. Whether the [trial c]ourt circumvented basic rules of evidence by admitting the insurer's "exhibit book"[] without requiring a foundation or witness authentication, including documents relied upon by the [trial c]ourt in reaching its verdict?

The Rhodeses' Brief at 4-5 (some internal capitalization omitted).

As this Court has recently explained:

Our Supreme Court has long recognized that "the utmost fair dealing should characterize the transactions between an insurance company and the insured." ***Dercoli v. Pa. Nat'l Mut. Ins. Co.***, 554 A.2d 906, 909 (Pa. 1989), *quoting* ***Fedas v. Ins. Co. of the State of Pa.***, 151 A. 285, 286

(Pa. 1930). Moreover, the insurance company has a duty to deal with its insured on a fair and frank basis, and at all times, to act in good faith.

In 1990, our legislature created a statutory remedy for bad faith conduct by an insurance company:

[42 Pa.C.S.A. § 8371]. Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

. . . [Our caselaw holds that,] to succeed on a claim under section 8371, the insured must show that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." ***See***, ***e.g.***, ***O'Donnell v. Allstate Ins. Co.***, 734 A.2d 901, 906 (Pa. Super. 1999), *citing* ***MGA Ins. Co. v. Bakos***, 699 A.2d 751, 754 (Pa. Super. 1997). To constitute bad faith it is not necessary that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith. The insured must also show that the insurer breached a known duty ( *i.e.*, the duty of good faith and fair dealing) through a motive of self-interest or ill will.

This Court has noted that the bad faith statute extends to the handling of UIM claims, despite their similarity to third party claims. Also, section 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may extend to the insurer's investigative practices.

> Bad faith conduct also includes lack of good faith investigation into facts, and failure to communicate with the claimant. . . .
>
> Bad faith claims are fact specific and depend on the conduct of the insurer *vis á vis* the insured.

**Grossi v. Travelers Personal Ins. Co.**, 79 A.3d 1141, 1148-1149 (Pa. Super. 2013) (some internal quotations and citations omitted).

The Rhodeses first claim that the trial court misunderstood their bad faith claim and that, as a result of this misunderstanding, the trial court "failed to consider" the following evidence of USAA's bad faith: USAA's "inadequate investigation" into their claim; USAA's "lowball offers" to the Rhodeses; USAA's "repeated rejection of its attorney's advice on valuation;" USAA's "failure to review the medical and other documentation relied upon by its attorney to support his recommendations;" USAA's "factual errors [that it] entered into the Colossus valuation program;" USAA's "abuse of the IME process;" and, USAA's "unlawful release agreements." The Rhodeses' Brief at 42.

The premise of the Rhodeses' claim – that the trial court misunderstood the scope of their bad faith claim – is based upon language contained in the trial court's opinion. Specifically, the Rhodeses base their argument upon the fact that, when the trial court defined the Rhodeses' claim in its opinion, the trial court quoted from this Court's definition of a bad faith claim, declaring that the Rhodeses "must [first] show the insurer lacked a reasonable basis for denying benefits (in this case, by not paying [the Rhodeses'] settlement demand sooner)." Trial Court Opinion, 7/19/13,

at 3; the Rhodeses' Brief at 42. According to the Rhodeses, by defining their claim in such a manner, the trial court failed to consider certain evidence offered in support of their bad faith claim. The Rhodeses' Brief at 42.

The Rhodeses' claim is meritless. Certainly, the trial court's definition of the Rhodeses' bad faith claim – declaring that the Rhodeses "must [first] show the insurer lacked a reasonable basis for denying benefits (in this case, by not paying [the Rhodeses'] settlement demand sooner)" – is, essentially, a word-for-word, dictionary definition of the first-prong of a bad faith claim in Pennsylvania. *See Grossi*, 79 A.3d at 1148-1149 ("to succeed on a claim under section 8371, the insured must show that the insurer **did not have a reasonable basis for denying benefits under the policy** and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim") (emphasis added) (internal quotations and citations omitted). Thus, and far from demonstrating that the trial court misunderstood the scope of the Rhodeses' bad faith claim, the trial court's accurate definition of the law demonstrates that it thoroughly understood and appreciated the claim that the Rhodeses were asserting.

Further, the trial court's definition of the Rhodeses' bad faith claim – as being that the Rhodeses must first show that the "insurer lacked a reasonable basis for denying benefits (in this case, by not paying [the Rhodeses'] settlement demand sooner)" – necessarily encompasses the various subparts to the Rhodeses' bad faith claim that, the Rhodeses assert, the trial court "failed to consider." Stated another way, since "bad faith" is

defined as an unreasonable denial or delay of benefits under a policy, the definition of bad faith necessarily includes claims regarding: USAA's "inadequate investigation" into their claim; USAA's "lowball offers" to the Rhodeses'; USAA's "repeated rejection of its attorney's advice on valuation;" USAA's "failure to review the medical and other documentation relied upon by its attorney to support his recommendations;" USAA's "factual errors [that it] entered into the Colossus valuation program;" USAA's "abuse of the IME process;" and, USAA's "unlawful release agreements." The Rhodeses' Brief at 42. To be sure, all of the above subparts concern either the "reasonableness" of USAA's actions or USAA's delay in failing to pay the Rhodeses' claim earlier. Therefore, the trial court's definition of the Rhodeses' claim encompassed all of the above-mentioned subparts to the Rhodeses' claim.

Finally, nothing in the trial court's opinion suggests that the trial court was unaware of the full extent of the Rhodeses' bad faith claim or that it improperly overlooked the evidence offered in support of their claim.[2] Clearly, the trial court's July 19, 2013 opinion – which we have quoted at length above – demonstrates that its verdict was based upon the entirety of USAA's conduct *vis à vis* the Rhodeses.

_____

[2] To the extent the Rhodeses attempt to disguise a weight of the evidence claim as one sounding in pure legal error, the claim fails because the entire premise of the claim – that the trial court "misapprehended" the Rhodeses' claim – fails.

The Rhodeses' first claim on appeal is based entirely upon the faulty premise that the trial court misunderstood the scope of their bad faith claim. Nothing in the trial court's discussion or analysis of the claims advanced by the Rhodeses suggests that this is the case. Therefore, since the Rhodeses' claim is based upon a faulty premise, the claim necessarily, and logically, fails.

Second, the Rhodeses claim that the trial court erroneously failed to "follow[] the law of the case established in the two prior opinions of [the Superior] Court regarding the focus of a bad faith claim, the scope of the insurer's conduct to be reviewed, and the evidence to be considered." The Rhodeses' Brief at 58. This claim fails.

Our Supreme Court has explained:

> the "law of the case" doctrine . . . refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

***Commonwealth v. Starr***, 664 A.2d 1326, 1331 (Pa. 1995) (internal citations omitted).

- 18 -

As was summarized above, this case has been before us on two prior occasions. On the first occasion, we vacated the portion of the trial court's order granting USAA's motion for summary judgment and affirmed the portion of the trial court's order denying the Rhodeses' motion for summary judgment. **_Rhodes I_**, 951 A.2d at 1225. On the second occasion, we vacated the trial court's discovery order, which had allowed for discovery of Attorney Serbin's work product. **_Rhodes II_**, 21 A.3d at 1257.

On appeal, the Rhodeses do not claim that the trial court mistakenly believed that Attorney Serbin's work product was somehow still discoverable or that its prior order, granting USAA's motion for summary judgment, was somehow still valid. Instead, within the argument section of the Rhodeses' brief, the Rhodeses assert a diverse collection of sub-claims, including that the trial court's opinion "fails to discuss" various evidence and claims that they put before the trial court, that the trial court erred in some of its pre-trial rulings (which were unrelated to the discovery of Attorney Serbin's work product), and that the trial court's verdict was against the weight of the evidence. The Rhodeses' Brief at 58-71. We fail to see how such claims relate to the "law of the case" that was established in the prior memorandum and opinion from this Court. At any rate, none of the Rhodeses' claims demonstrate that the trial court attempted to "alter the

resolution of a legal question previously decided by" this Court.[3] **Starr**, 664 A.2d at 1331. The Rhodeses' second claim on appeal thus fails.[4]

The Rhodeses' final three claims on appeal all concern the trial court's evidentiary rulings.

We have explained:

_____

[3] With respect to the Rhodeses' second claim on appeal, most of the subparts are based upon the contention that the trial court's opinion "failed to discuss" a particular claim or piece of evidence that the Rhodeses had put before the trial court. According to the Rhodeses, the trial court's "failure to discuss" the reason it rejected certain claims or found certain evidence unpersuasive meant that the trial court simply did not understand the scope of their bad faith claim or the prior "law of the case." **See** the Rhodeses' Brief at 58-71.

The Rhodeses' argument is legally unfounded. First, Pennsylvania Rule of Appellate Procedure 1925(a) merely requires that the trial court "file of record at least **a brief opinion** of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found." Pa.R.A.P. 1925(a)(1). In the case at bar, the trial court's detailed 13-page opinion in support of its verdict and its subsequent Rule 1925(a) opinion undoubtedly satisfy Rule 1925(a). Second, it is not surprising that the trial court's opinions might have failed to discuss certain facets of the Rhodeses' bad faith claim or certain evidence that the Rhodeses introduced at trial, given that the Rhodeses filed a 29-page post-trial motion and a Rule 1925(b) statement that contained seven claims with multiple subparts. **See** the Rhodeses' Post-Trial Motion, 7/25/13, at 1-29; the Rhodeses' Rule 1925(b) Statement, 10/11/13, at 1-3.

[4] If the Rhodeses wished to claim that the trial court erred in one of its pre-trial rulings or that the verdict was against the weight of the evidence, the Rhodeses should have asserted such a claim independently. We merely hold that the rulings and the verdict do not offend the "law of the case," as the challenged rulings and verdict neither revived the overturned grant of summary judgment to USAA nor held that Attorney Serbin's work product was somehow still discoverable.

> Admission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.
>
> To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. . . . A party suffers prejudice when the trial court's error could have affected the verdict.

*Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 100-101 (Pa. Super. 2011) (internal quotations and citations omitted); *see also B & L Asphalt Indus. v. Fusco*, 753 A.2d 264, 270-271 (Pa. Super. 2000) ("[a]n evidentiary ruling which [does] not affect the verdict will not provide a basis for disturbing the fact-finder's judgment") (internal quotations, citations, and corrections omitted).

The Rhodeses' third numbered claim on appeal contends that the trial court erred in "quashing the insureds' timely served Rule 234.3 Notices to Attend and Produce [D]ocuments, directed to the insurer's management employees involved with the claim, and thereafter abused its discretion by refusing to apply the missing witness rule when the identified employees did not attend." The Rhodeses' Brief at 4. Specifically, within their brief, the Rhodeses claim that the trial court erred when it quashed the notice for USAA employee, John Timothy Hanley, to produce "the original claims file" at trial and that the trial court erred when it refused to apply the "missing

witness rule" to John Timothy Hanley and Katherine Ortiz.[5]  ***Id.*** at 71-74. These claims fail.

On November 7, 2011, Attorney Serbin served notices to attend and to produce documents on USAA's attorney, directing that the following individuals appear for the December 5, 2011 trial:  Blanca Alma Trevino, Linda Reyna Barboza, Katherine Ortiz, "USAA CIC's Corporate Designee (familiar with USAA's underinsured practices)", John Timothy Hanley, and "USAA CIC's Corporate Designee (familiar with [USAA's] fiscal matters)." The notices further declared that Mr. Hanley was to bring with him to the trial "[t]he original unredacted claims log records and all related files dealing in any[] way with the underinsured motorist claims of [the Rhodeses,] including exact copies of all computer system entries and hard document file[s] in the possession or control of [USAA]."  ***See*** the Rhodeses' Affidavit of Service of Notices to Attend, 11/14/11, at 1; Notice to Attend to John Timothy Hanley, 11/7/11, at 1.

_____

[5] With respect to the Rhodeses' third numbered claim on appeal, their Pa.R.A.P. 2116(a) "statement of question involved" is phrased far more broadly than the actual claim that is contained in the argument section of their brief.  ***See*** the Rhodeses' Brief at 4; the Rhodeses' Brief at 71-74.  To the extent that the Rule 2116(a) statement suggests issues that have not been developed in the argument section of the brief, those undeveloped issues are waived.  ***Harkins v. Calumet Realty Co.***, 614 A.2d 699, 703 (Pa. Super. 1992) ("[i]ssues in the statement of questions presented and not developed in argument are [] deemed waived").

The notices to attend and to produce documents were filed pursuant to Pennsylvania Rule of Civil Procedure 234.3(a), which provides:

> Rule 234.3. Notice to Attend. Notice to Produce
>
> (a) A party may compel the attendance of another party or an officer or managing agent thereof for trial or hearing by serving upon that party a notice to attend substantially in the form prescribed by Rule 234.7. The notice shall be served reasonably in advance of the date upon which attendance is required. The notice may also require the party to produce documents or things.

Pa.R.C.P. 234.3(a).

On November 22, 2011, USAA filed a motion to quash the notices to attend, pursuant to Pennsylvania Rule of Civil Procedure 234.4. In relevant part, Rule 234.4 provides:

> Rule 234.4. Subpoena. Notice to Attend. Notice to Produce. Relief From Compliance. Motion to Quash.
>
> . . .
>
> (b) A motion to quash a subpoena, notice to attend or notice to produce may be filed by a party, by the person served or by any other person with sufficient interest. After hearing, the court may make an order to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense.

Pa.R.C.P. 234.4(b).

Within USAA's motion to quash, USAA noted that Ms. Trevino would attend the trial in Blair County, Pennsylvania. However, USAA argued that Ms. Ortiz, Mr. Hanley, and Ms. Barboza, were all Texas residents, over whom the trial court did not have jurisdiction and that Ms. Barboza was no longer

employed by USAA. USAA's Motion to Quash, 11/22/11, at 1-3. Therefore, USAA requested that the trial court quash the notices to attend. Further, USAA contended that the Rhodeses' notice for Mr. Hanley to produce the documents failed because USAA had already provided the files during discovery and had "already given [the Rhodeses'] counsel the unredacted claim notes." *Id.* at 3; *see also* USAA's Response to the Rhodeses' Request for Production of Documents and Things under Rule 4009.11, 1/13/05, at 1 ("[USAA] has provided a copy of its relevant claim file that was maintained from the inception of the claim through the time of the settlement. A complete copy of the relevant file maintained by Attorney Kormanski has also been provided").

By order dated December 2, 2011, the trial court granted USAA's motion to quash the notices to attend and to produce documents, but the trial court ordered that USAA must have a corporate designee representative at trial. Trial Court Order, 12/5/11, at 1.

The case proceeded to trial, during which time: the trial court admitted the deposition testimony of Ms. Ortiz, Mr. Hanley, and Ms. Barboza; Ms. Trevino testified in person; Attorney Kormanski testified in person; USAA presented corporate designee Gary Stephen Duke for examination and Mr. Duke testified at trial; and, the Rhodeses introduced documentary evidence from USAA's and Attorney Kormanski's case files, regarding the handling of the Rhodeses' UIM claim.

Now on appeal, the Rhodeses claim that the trial court erred in quashing their notice to produce "the original claims file."[6]  According to the Rhodeses, "[h]ad the original claims file been produced, [the Rhodeses] would have been able to conclusively establish what medical records, doctors' reports, disfigurement photos[,] and economic loss information were in [USAA's] claims files, as differentiated from [Attorney] Kormanski's file, on each occasion [USAA] rejected [Attorney Kormanski's] advice on valuation."  The Rhodeses' Brief at 73.

The Rhodeses are not entitled to relief on their claim, as they were not prejudiced by the trial court's action.  Certainly, the Rhodeses do not claim that USAA failed to produce copies of the UIM case file during discovery or that USAA failed to comply with the trial court's discovery orders.  Further, the Rhodeses do not contradict USAA's earlier averments that USAA had "already given [the Rhodeses'] counsel the unredacted claim notes" or that "[USAA] has provided a copy of its relevant claim file that was maintained from the inception of the claim through the time of the settlement.  A complete copy of the relevant file maintained by Attorney Kormanski has also been provided."  USAA's Response to the Rhodeses' Request for

_____

[6] With respect to the trial court's order quashing the notices to attend and to produce documents, the Rhodeses argue only that they were prejudiced by the quashal of their notice to produce "the original claims file."  The Rhodeses' Brief at 73.  Therefore, the Rhodeses have preserved only this particular claim on appeal.

Production of Documents and Things under Rule 4009.11, 1/13/05, at 1. Rather, the Rhodeses merely argue that they were entitled to "the original claims file" so that they could "conclusively establish" what documents USAA had in its possession at certain times, particularly those occasions on which it received advice from Attorney Kormanski. The Rhodeses' Brief at 73.

We conclude that the Rhodeses' were not prejudiced by the trial court's quashal of their notice to produce "the original claims file," as the record demonstrates that the Rhodeses already had a copy of USAA's claims file – and, from this copy, the Rhodeses were able to establish what documents USAA had in its possession and at what times. *See also* N.T. Trial, 12/5/11 (morning) at 18-89; N.T. Trial, 12/5/11 (afternoon) at 2-126; N.T. Trial, 12/6/11, at 1-197 (Ms. Trevino testifies as to "what medical records, doctors' reports, disfigurement photos[,] and economic loss information were in [USAA's] claims files, as differentiated from [Attorney] Kormanski's file, on each occasion [USAA] rejected [Attorney Kormanski's] advice on valuation"). The Rhodeses' claim to the contrary fails.

With respect to the second and third sub-parts to the Rhodeses' claim, the Rhodeses argue that the trial court erred in failing to apply the "missing witness rule" to Mr. Hanley and Ms. Ortiz. The claims are waived.

We have held:

> Generally, when a potential witness is **available to only one** of the parties to a trial, and it appears this witness has **special information material to the issue**, and this person's testimony would **not be merely cumulative**, then if such party does not produce the testimony of this

witness, the [fact-finder] may draw an inference it would have been unfavorable.

*Kovach v. Solomon*, 732 A.2d 1, 8-9 (Pa. Super. 1999) (emphasis in original), *quoting* *Commonwealth v. Moore*, 309 A.2d 569, 570 (Pa. 1973).

The Rhodeses have failed to develop their missing witness claim on appeal. Within their brief, the Rhodeses have provided this Court with absolutely no argument as to what "special information" Mr. Hanley or Ms. Ortiz might have possessed and the Rhodeses do not claim that either Mr. Hanley's or Ms. Ortiz's testimony would have been non-cumulative. *See* the Rhodeses' Brief at 73-74. As such, the Rhodeses' claim on appeal is waived. *Commonwealth v. Padilla*, 80 A.3d 1238, 1255 n.16 (Pa. 2013) ("an undeveloped claim is waived").

The Rhodeses' fourth numbered claim on appeal asserts that the trial court erred in precluding the deposition testimony of Fred P. Brookes. This claim is meritless.

During the time period that USAA was handling the Rhodeses' UIM claim, Mr. Brookes was one of USAA's litigation claims advisors. N.T. Deposition of Fred P. Brookes, 9/28/09, at 10. However, Mr. Brookes retired from USAA in January 2004 (which was over five years prior to his September 2009 deposition) and Mr. Brookes, unfortunately, passed away in December 2009 (which was two years prior to trial in this case).

During Mr. Brookes' deposition, he testified to (what he remembered of) his job responsibilities and the job responsibilities of USAA's claims

handlers. ***Id.*** at 6-68. Regarding the handling of the Rhodeses' UIM claim, Mr. Brookes specifically testified that he could not remember any part of the Rhodeses' claim, his role in handling the claim, or Ms. Barboza's and Ms. Trevino's role in handling the claim. ***See***, ***e.g.***, ***id.*** at 112 (Mr. Brookes testified: "I don't remember anything about this case"); N.T. Deposition of Fred P. Brookes, 9/29/09, at 103 ("Q: Have any of the documents that [Attorney] Serbin show[ed] you in this case refreshed your recollection of the claim at all?; A: No. Other than to say, I see what I read there. Okay. I still don't have no recollection of it"). Finally, Mr. Brookes read aloud the entries in USAA's case file for the Rhodeses' UIM claim.

Prior to trial, USAA moved to preclude Mr. Brookes' deposition testimony at trial because Mr. Brookes had no personal knowledge of the Rhodeses' UIM claim and his memory was never refreshed during the deposition. The trial court granted USAA's motion and precluded Mr. Brookes' deposition testimony at trial. Trial Court Order, 11/4/11, at 1. Nevertheless, during trial, the Rhodeses introduced the very same records that Mr. Brookes read aloud during the deposition, and the Rhodeses presented the testimony of Ms. Trevino to read and explain the notations contained in USAA's case file. ***See*** N.T. Trial, 12/5/11 (morning) at 18-89; N.T. Trial, 12/5/11 (afternoon) at 2-126; N.T. Trial, 12/6/11, at 1-197.

The Rhodeses make no credible claim that they suffered prejudice as a result of the trial court's exclusion of Mr. Brookes' deposition testimony. Certainly, Mr. Brookes testified that he had no recollection, whatsoever, of

the way in which USAA handled the Rhodeses' UIM claim and, during trial, the Rhodeses introduced the same records that Mr. Brookes read aloud during the deposition.[7]  The Rhodeses' fourth claim on appeal fails.

_____

[7] Within the Rhodeses' brief, they claim that they were prejudiced by the exclusion of Mr. Brookes' deposition testimony because he "confirmed" that "an adequate investigation would routinely include requesting medical and employment authorizations . . . [, that i]t would be routine to secure a statement from the insured . . . [, and that] fairness would require that a doctor form an opinion after he's reviewed the medical records and performed the medical exam."  The Rhodeses' Brief at 79.  At the outset, Mr. Brookes did not "confirm" that an adequate investigation would require USAA to request medical and employment authorizations or secure a statement from the insured.   Rather, Mr. Brookes testified that, where a claimant is represented by counsel (as the Rhodeses were in this case), it is **counsel's** responsibility to provide USAA with the necessary documents. Mr. Brookes testified:

> If we need wage loss authorization or medical authorization and the claimant is represented, then it is incumbent upon you to provide us with documentation that we need to properly evaluate your client's case.  Now, if you don't do that, what can we do?

N.T. Deposition of Fred P. Brookes, 9/28/09, at 34.

Further, a fact-finder does not need the testimony of Mr. Brookes to determine that "fairness would require that a doctor form an opinion after he's reviewed the medical records and performed the medical exam."  The Rhodeses' Brief at 79.

The Rhodeses also claim that Mr. Brookes' deposition testimony was important "to the issue of credibility" because "USAA represented . . . that [Mr.] Brookes was not [Ms.] Trevino's supervisor [and Ms.] Trevino testified [Mr.] Brookes had no authority to settle claims, and was limited to making recommendations."  The Rhodeses' Brief at 79 (internal citations omitted). However, **Mr. Brookes himself** testified that he was not Ms. Trevino's supervisor and that he was "limited to making recommendations."  N.T. Deposition of Fred P. Brookes, 9/28/09, at 26 (Mr. Brookes testified that he
*(Footnote Continued Next Page)*

Finally, the Rhodeses claim that the trial court erred when it admitted all of USAA's exhibits.  This claim is waived, as the Rhodeses failed to specify at trial which of USAA's 160-plus exhibits were improperly admitted.  ***See*** N.T. Trial, 12/9/11 (afternoon), at 69 (the Rhodeses' attorney declares: "Well, Your Honor, I have to object to the admission of the entire defense notebook"); Pa.R.E. 103(a)(1) ("[a] party may claim error in a ruling to admit . . . evidence only [if the party] . . . (A) makes a timely objection . . .; and (B) states the specific ground, unless it was apparent from the context"); ***see also Commonwealth v. Manley***, 985 A.2d 256, 262 (Pa. Super. 2009) (a claim that is too vague to permit appellate review is waived).

Judgment affirmed.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2014

*(Footnote Continued)* ————————

was not Ms. Trevino's manager); N.T. Deposition of Fred P. Brookes, 9/28/09, at 21 (Mr. Brookes testified: "[t]he position I was in, I gave my advice.  If they followed it, fine.  If they don't, fine. I gave my advice. That's the best I can do."). Therefore, we fail to see how Mr. Brookes' deposition testimony could have cast doubt on either USAA's or Ms. Trevino's representations:  Mr. Brookes' deposition testimony **confirmed** the representations.